William P. FLANAGAN, Victor B. Morris, and Donald M. Bjornsrud, Plaintiffs–Appellants,

v.

James MUNGER and City of Colorado Springs, Defendants–Appellees,

American Civil Liberties Union of Colorado, Amicus Curiae.

No. 86–2076.

United States Court of Appeals, Tenth Circuit.

Dec. 8, 1989.

Craig M. Cornish, Colorado Springs, Colorado, for Plaintiffs–Appellants.

Gordon L. Vaughan of Hall & Evans, Colorado Springs, Colo., for defendants-appellees, Alan Epstein of Hall & Evans, Den-

ver, Colo., with him on the brief for defendant-appellee James Munger.

Kathleen A. Carlson and Peter M. Susemihl of Susemihl, Lohman, Kent, Carlson & McDermott, P.C., Colorado Springs, Colo., on the brief for defendant-appellee City of Colorado Springs.

Robert L. Connelly, Jr. and Robert Douglas Clark of Isaacson, Rosenbaum, Spiegleman, Woods, Levy & Snow, P.C., Denver, Colo., on the brief for amicus curiae.

Before McKAY and BRORBY, Circuit Judges, and PARKER, District Judge *.

McKAY, Circuit Judge.

When this lawsuit was filed, appellants were high-ranking police officers with the Colorado Springs Police Department.[1] Officer William Flanagan had been with the department for twenty years, ten of those as a deputy police chief. Officer Donald Bjornsrud had been with the department for twenty-two years and was serving as the Administrative Lieutenant of the patrol bureau.

In the summer of 1985, the three original plaintiffs and Mr. Richard Paul, an investor with video rental experience, formed a corporation for the purpose of opening and operating a video rental store. Each participant held a twenty-five percent ownership interest in the corporation, although Mr. Paul was responsible for organizing and operating the video store.

In September 1985, Mr. Paul purchased in bulk approximately 2500 used video tapes for the corporation. Mr. Paul designated approximately 100, or less than four percent of the tapes, adult films.[2] These tapes were displayed sideways on a six-foot-high shelf labeled "Adult Films."

Only the films' titles were visible from the shelf in order not to expose the public to potentially sexually explicit film covers. Store policy prohibited renting adult films to persons under the age of twenty-one.

On or about November 13, 1985, James Munger, Colorado Springs' Chief of Police, received an anonymous letter alleging that Colorado Springs police officers "were co-owners of a Porno Video business." In response to the letter, Chief Munger ordered an internal affairs investigation conducted by a detective from the Denver Police Department. In late November 1985, the detective rented a total of four adult films from plaintiffs' video store and viewed the tapes with three members of the Colorado Springs Police Department Internal Affairs Unit. At Chief Munger's request, an FBI agent with expertise in obscenity law also viewed the tapes.

On November 27, 1985, Chief Munger notified plaintiffs of the investigation. The Chief informed them that the investigators had determined that the adult films under investigation were not obscene under Colorado's criminal statutes.[3] He also informed them that the investigation was continuing with regard to possible violations of Colorado Springs Police Department regulations regarding approval for off-duty employment and conduct unbecoming an officer. Ultimately, the investigating officers found that each plaintiff had violated the off-duty employment regulation, but made no determination regarding a possible violation of the unbecoming conduct regulation.

On December 9, 1985, Chief Munger asked plaintiffs to remove all sexually explicit films from their rental store inventory. Chief Munger told the plaintiffs that if

* Honorable James A. Parker, United States District Judge for the District of New Mexico, sitting by designation.

1. Victor B. Morris, one of the three original plaintiffs, voluntarily dismissed his complaint after appellants filed their notice of appeal.

2. "Adult films" included films rated "X" by the Motion Picture Association and films Mr. Paul considered inappropriate for rental to anyone under the age of 21.

These adult films graphically depicted explicit sexual acts between men and women, but did not contain child pornography, bestiality or sadomasochism. The plaintiffs specifically requested that Mr. Paul ensure that none of the tapes were legally obscene under federal, state, or local law.

3. The Chief admitted in pleadings that the films were not outside the protection of the first amendment nor in violation of any federal, state, or local laws.

they refused to voluntarily remove the tapes, he would order them to do so. He also informed plaintiffs that he would be issuing a reprimand against them for violations of departmental regulations. In response to the Chief's request, plaintiffs removed sexually explicit videos from the store's shelves.

On December 16, 1985, a local reporter contacted one of the plaintiffs in order to verify information she had received that the plaintiffs ran a video store which rented X-rated films and that the plaintiffs would receive a written reprimand from the department for their activities. The plaintiff told the reporter that the video store had removed all adult films at Chief Munger's request. He also told her that plaintiffs had not been reprimanded, nor did he believe that they would be.

After this conversation, the plaintiff immediately contacted the other plaintiffs and arranged a meeting with Chief Munger. Then Chief Munger, believing he had the consent of plaintiffs, responded to the local news reporter's earlier questions to him and communicated the charges against plaintiffs, the results of the internal affairs investigation, and the fact that the officers would receive written reprimands. The local press ran several articles regarding the information released by Chief Munger.

Chief Munger issued written reprimands for violations of sections C 1300 "Standards of Conduct," C 1301.25 "Conduct Unbecoming An Officer," and C 1360.01 "Obtaining Approval" for off-duty employment. Chief Munger admitted that plaintiffs would not have been reprimanded for failing to obtain approval for off-duty employment if they had not violated the conduct-unbecoming regulation by renting or selling sexually explicit videos. Thus, it is conceded that plaintiffs' "speech" activity, renting videos, was the substantial motivating factor of each of the reprimands. The reprimands were placed in each plaintiff's personnel file.

In their original and amended complaints, plaintiffs alleged that defendants violated their first amendment rights, federal and state constitutionally-protected privacy rights, various federal and state procedural due process rights, federal and state due process rights based on the vagueness of the departmental regulations, and federal and state equal protection rights. Officer Flanagan also alleged that Chief Munger retaliated against him for participating in the video store and for filing suit by failing to reappoint him as deputy chief, a position he had held in the department for ten years.

Chief Munger denied liability, contending that he enjoyed qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The City of Colorado Springs also denied liability, contending that it was not liable for Chief Munger's actions under the principles articulated in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

On defendants' motion, the trial court dismissed all of plaintiffs' state claims for relief. Plaintiffs moved for partial summary judgment on their first amendment and void for vagueness claims. The defendants moved to dismiss or in the alternative for summary judgment on all claims. The trial court granted summary judgment for the defendants on all causes of action.

Plaintiffs appeal the trial court's grant of summary judgment to defendants and its denial of summary judgment to plaintiffs on the freedom of speech and void for vagueness claims. We review an order granting or denying summary judgment under the same standard applied by the trial court in determining whether summary judgment is proper. *United States v. Gammache,* 713 F.2d 588, 594 (10th Cir. 1983). Summary judgment is proper if the record before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c).

### I. Free Speech Claim

The facts of this appeal are essentially undisputed. Because there is no genuine issue as to any material fact regarding

plaintiffs' free speech claim, we address whether Chief Munger and the City are entitled to judgment as a matter of law.

### A. The *Pickering* Test

The Supreme Court test for determining whether an employee is entitled to first amendment protection for engaging in "speech" at work or related to work is found in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Under the *Pickering/Connick* test, in order to assess whether a public employer has violated an employee's right to freedom of speech, a court is to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. Thus, we normally analyze the issue in two steps: We first determine whether the employee's speech is upon a matter of public concern, and if so,[4] we balance the employee's interest in free speech against the "government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692.

Although this case involves public employer discipline for public employee speech, it is factually and conceptually different from the typical *Pickering/Connick* fact pattern. A typical *Pickering/Connick* case involves an employee who has been terminated or disciplined by a public employer for critical and allegedly disruptive comments made about work.[5] This case involves "speech" which is off the job and unrelated to any internal functioning of the department.

However, the Supreme Court has extended the *Pickering/Connick* test to a case which does not fully replicate the original *Pickering/Connick* fact situation. In *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), a county constable fired a clerical employee in his office who, when referring to the attempted assassination of President Reagan, stated, "if they go for him again, I hope they get him." This statement did not address any aspect of the public employer's enterprise. For the first time, the Court did not address the usual *Pickering* problem, whether a statement about work is so publicly significant that it addresses concerns of the community rather than merely disrupting the public enterprise. By using *Pickering* to test *Rankin*'s statements, the Court extended *Pickering*'s applicability to a class of cases in which a public employer takes adverse employment action against a public employee for making a statement which is unrelated to employment but is made at work.

Although the Supreme Court has extended the *Pickering/Connick* test to a case which involves speech at work but not about work, we do not believe that the *Pickering/Connick* public concern test logically extends two more steps to this case in which a public employee (1) engages in nonverbal protected expression which is (2) neither at work nor about work. The public concern test requires that we first determine whether a plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. As we discuss below, it is nearly impossible to logically apply the public concern test to the present case in which an employee engages in nonverbal protected expression neither at work nor about work. However, the balancing prong of the *Pickering/Connick* test is still easy to apply in this situation. A court can still compare an

---

**4.** If an employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [the employer's adverse employment decision]. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690.

**5.** *See, e.g., Pickering*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; *Connick*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708; and *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

employee's interest in free speech and his employer's interest in the efficient functioning of government even with nonverbal protected expression.

Initially, we note that the language used by the Supreme Court in explaining the public concern test indicates its inapplicability to the present fact situation. The Supreme Court requires that the employee's speech comment "upon matters of public concern." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. It is difficult to comprehend how each of the officer's owning of a one-quarter interest in a video store which rents a small portion of sexually explicit videos is making a "comment" on any subject, especially a subject of public concern. Owning a store that rents movies isn't necessarily commentary about the desirability of these films. This is not debate or explicit verbal speech. If plaintiffs had made off-duty statements supporting sexually explicit films, those comments would almost surely relate to a matter of public concern. However, it is not clear that part ownership of a video store which rents a small portion of sexually explicit videos is commentary at all.[6] Thus, the language in the *Pickering/Connick* cases requiring commentary on a matter of public concern is difficult to apply in this situation.

The specificity of precedential language in our circuit further indicates that the public concern test was not intended to apply to situations of this type. In *Wilson v. City of Littleton, Colo.*, 732 F.2d 765, 769 (10th Cir.1984), we stated that "it is not always enough that '[the speech's] *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest.' [*Connick*, 461 U.S. at 148, 103 S.Ct. at 1691] n. 8 (emphasis added). What is actually said on that topic must itself be of public concern." The language of *Koch v.*

*City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988), is also troubling. "[T]his circuit has already indicated that what is of general interest to the public is not necessarily of public concern for First Amendment purposes." In *Wren v. Spurlock*, 798 F.2d 1313 (10th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987), we recognized that "it is not always enough that the subject matter of a communication be one in which there might be general interest, ... but that what is *actually said* on the topic is the crux of the public concern content inquiry." *Id.* at 1317 n. 1 (emphasis in original; citations omitted). In these cases, we construe "public concern" very narrowly, limiting first amendment protection to statements made by public employees which *"sufficiently inform [an] issue"* of public concern. *Wilson*, 732 F.2d at 768.

The language of these cases is very difficult to apply to the situation presented by this case. Again we note that it is difficult to understand how the plaintiffs are "actually [saying]" anything by part ownership of the store. Since the plaintiffs have made no statement about the films, it is difficult to understand how they are "sufficiently inform[ing an] issue" of public concern. Our cases seem to require that something actually be said on the topic. However, even if we accept the proposition that showing the films is implicitly a statement that plaintiffs favor the films, such a statement is not easily covered by the existing cases. It is not clear how an implicit statement can sufficiently inform an issue of public concern or contribute to the debate over sexually explicit films.

Another problem with *Wilson, Koch,* and *Wren* is that they involve speech that occurred at work or about a work-related

---

6. An alternative analysis of this case would hold that by owning a percentage of a video store which rents sexually explicit videos, the plaintiffs are implicitly making a comment about the desirability of such videos. Since obscenity is a topic of general public interest, under this line of reasoning, the plaintiffs could be making a comment on a matter of public concern. However, we believe that such an analysis is stretching to artificially force this case into the existing framework of the *Pickering* test. We believe that the case is more accurately analyzed under the alternative framework explained below. Nevertheless, the result reached under either analysis may be the same. If the "speech" is of public concern, then the court is ultimately required to balance the employer's ability to protect the work environment and the employee's right to free speech.

subject. When a statement is made at or about work, use of the public concern test, indeed a narrow definition of public concern, makes sense. The test helps define public concern in an area in which the critical distinction should be whether the speech at issue takes on significance outside the workplace or whether it deals primarily with an employee's personal employment problem. However, in a case like this of nonverbal protected expression not at or about the workplace, the "speech" already takes place outside of the workplace and thus the purpose behind using the public concern test is simply irrelevant.

The formulation of the public concern test in *Connick* and its progeny also implies that the test is not intended to apply to areas in which the employee does not speak at work or about work. "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Thus, the *Connick* public concern test is intended to weed out speech by an employee speaking *as* an employee upon matters only of personal interest. The speech of the plaintiffs in this case is clearly not speech as an employee, and thus does not fulfill the purpose of the public concern test. A Fourth Circuit case makes the point clear. "*Pickering*, its antecedents, and its progeny—particularly *Connick*—make it plain that the 'public concern' ... inquiry is better designed ... to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is." *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir.1985).[7] Clearly, plaintiffs are not speaking as employees and thus do not fit the narrow spectrum which the public concern test is meant to identify.

■ Thus, we conclude that the public concern test does not apply when public employee nonverbal protected expression does not occur at work and is not about work. Nevertheless, we believe that an alternative test can be applied in these cases which can fulfill the same function as the public concern test. We hold that the public concern prong of the *Pickering/Connick* test cannot be applied to a case of nonverbal expression that does not occur at work or is not about work. The alternative test should be whether the speech involved is "protected expression." If the speech involved is protected expression, then the second half of the existing *Pickering* test—the balancing between the

7. The only appellate court that has considered a case in which a police officer was disciplined for speech not at or about work is the *Berger* court. In *Berger*, a police officer performed blackface which was offensive to certain members of the public. The *Berger* court applied the *Pickering* test to the police officer's speech. However, since the court explained the factual differences and yet gave no reasoning for extending *Pickering*, it appears that the court applied the test because of the inertia of previous decisions applying *Pickering* in employment cases.

We do not find the *Berger* court's use of the *Pickering* test persuasive. However, we do agree with the result of the case. While it is true the *Berger* case and this case can be factually distinguished (the *Berger* case involved the actual performance of entertainment while this case involves only the distribution of "entertainment"), analytically the two cases are indistinguishable. Both cases involved off-duty entertainment "speech" by police officers which did not "add" to debate. Thus, the *Berger* case provides a persuasive prior resolution of very similar issues, although obviously we are not bound by Fourth Circuit precedent. The result of the *Berger* court is in line with the result which we reach in this case, although we adopt a slightly different approach.

There are also two appellate court cases that deal with off-duty police officer activities under the freedom of association doctrine of the first amendment. *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir.1984); *Battle v. Mulholland*, 439 F.2d 321 (5th Cir.1971). These cases are only marginally relevant, however, because they do not deal with speech and they do not apply the *Pickering* balancing test, although they both cite *Pickering*. Nevertheless, these cases also support the approach we adopt in this case. The central question addressed in each case is whether the activity involved is constitutionally protected. The cases do not even attempt to apply the public concern prong of *Pickering*. Indeed, we express some doubt whether the *Pickering* test, particularly the public concern prong, applies in freedom of association cases.

employee's right to free speech and the employer's right to curtail activity which interferes with the efficient operation of the office—should be applied. This approach is consistent with the underlying principles behind the *Pickering* and *Connick* decisions and their application of the public concern test. Even the Fourth Circuit in the *Berger* case, which applied the public concern test, agreed that the principles behind the cases would support an approach of this type.

> The principle that emerges is that *all* public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely "personal concern" to the employee—most typically, a private personnel grievance.

*Berger*, 779 F.2d at 998 (emphasis in original).

The purpose of the public concern test is to avoid raising personal personnel grievances to constitutional cases. This purpose is also served by a test which requires cases involving employee nonverbal expression which is not at work nor about work to involve protected expression. In those cases the employee is not raising a personal personnel grievance, and it makes little sense to ask whether this speech is of public concern.

■ Applying the above test to this case, it is clear that plaintiffs' speech is protected expression. Sexually explicit films and the distribution of sexually explicit films have consistently been upheld as protected under the first amendment, whether under the free speech or free press clauses. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Times Film Corp. v. City of Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 499–500, 72 S.Ct. 777, 779, 96 L.Ed. 1098 (1952); *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); and *Neiderhiser v. Borough of Berwick*, 840 F.2d 213 (3d Cir.

1988). *Cf. Winters v. New York*, 333 U.S. 507, 509, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948). Since this speech is off the job and not related to the internal functioning of the department and is clearly protected expression under the first amendment, we then proceed to the balancing portion of the *Pickering* test.

## B. Balancing

■ Under *Pickering*, we must balance plaintiffs' interest in engaging in this protected expression against the state's interest as an employer in "promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1735. When balancing, we consider the content, context, manner, time, and place of the employee's expression. *Connick*, 461 U.S. at 152–53, 103 S.Ct. at 1693. Pertinent considerations include "whether the [expression] impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987) (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37). Essentially, the balance must tip in favor of protection "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Childers v. Independent School Dist. No. 1 of Bryan County*, 676 F.2d 1338, 1341 (10th Cir.1982).

■ Under the formulation above, we hold that the *Pickering* balance tips in favor of plaintiffs, thereby protecting them from adverse employment action based upon their speech. The *Pickering* test balances the plaintiff's interest in engaging in free speech, not the value of the speech itself. Plaintiffs have a substantial interest in engaging in this protected expression. Plaintiffs have an interest in exercising their constitutional rights, particularly their right to freedom of speech and press. Although plaintiffs' speech may not be as

"valuable" as political or social comment, we think that this type of off-duty public employee speech must be

> accorded the same weight in absolute terms that would be accorded comparable ... expression by citizens who do not work for the state.... We do not ... read the *Pickering, Givhan* and *Connick* Court's emphasis on the importance attached to speech on matters involving public affairs and the operations of government as implying that employee speech on other matters lying within the first amendment's general protection should be accorded little weight in the public employee speech balancing process. That emphasis in those cases we think simply reflected the fact that that was the type of speech involved in each, and that in content such speech does indeed embody core first amendment values.

*Berger,* 779 F.2d at 999–1000.

The defendants' interest in preventing plaintiffs' speech is much more attenuated. Chief Munger's articulated reason for prohibiting plaintiffs from renting sexually explicit films was that if members of the public knew that officers were renting them, negative public feelings about the distribution of sexually explicit films would erode the public's respect and confidence in the police department. This erosion of public confidence and respect would discourage citizens from cooperating with the department, thereby inhibiting the efficiency and effectiveness of it in the community.

We note first that Chief Munger did not argue that *plaintiffs' speech* "impair[ed] discipline by superiors or harmony among coworkers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of [plaintiffs'] duties or interfere[d] with the regular operation of the enterprise." *Rankin,* 107 S.Ct. at 2899. Rather, defendants argued that reaction by offended members of the public would adversely impact its external relationships and operations.

Arguably, "the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself,* of the public employer's *internal* operations and employment relationships." *Berger,* 779 F.2d at 1000 (emphasis added); *see also Connick,* 461 U.S. at 151, 103 S.Ct. at 1692; *Givhan,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4; *Pickering,* 391 U.S. at 570, 88 S.Ct. at 1735. The record is devoid of evidence of actual, or potential, disruption of the department's internal operations—no discipline problems, no disharmony, no impact on close working relationships, and no performance problems by plaintiffs. Defendants' case revolves solely around evidence of the potential disruption of the department's *external* relationships and operations.[8] Even if disruption of *external* operations could justify defendants' actions under *Pickering* and its progeny, their justification must fail under another theory.

The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future. The Supreme Court has squarely rejected what it refers to as the "heckler's veto" as a justification for curtailing "offensive" speech in order to prevent public disorder. *See, e.g., Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). *See also Berger,* 779 F.2d at 1001. The record is devoid of evi-

---

**8.** The Fourth Circuit has held that even the disruption of the police department's external relationships and operations to the extent of picketing and potential altercations between blacks and whites did not justify disciplinary action in faithfulness to first amendment principles.

> Here not only was the perceived threat of disruption only to external operations and relationships, it was caused not by the speech itself but by threatened reaction to it by offended segments of the public. Short of direct incitements to violence by the very content of public employee speech ..., we think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech.

*Berger,* 779 F.2d at 1001.

dence of actual or potential internal disruption caused by plaintiffs' speech.[9] Defendants' evidence pointed only to potential problems which might be caused by the public's reaction to plaintiffs' speech. "[A]pprehension of disturbance is not enough to overcome the right to freedom of expression." *Battle v. Mulholland,* 439 F.2d 321, 324 (5th Cir.1971) (quoting *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506–07, 89 S.Ct. 733, 736–37, 21 L.Ed.2d 731 (1969)). The Supreme Court's rejection of the heckler's veto lends support to our holding that the defendants have only an attenuated interest in preventing plaintiffs' speech.

The final reason that we reject the police department's justification for disciplining the plaintiffs based on the public's reaction to the plaintiffs' speech is the possibility that such a justification could be extended to future cases in which even greater problems could result. For example, a citizen might find a police officer who rented sexually explicit films for his own personal use objectionable. If the public's reaction to an officer's off-duty "speech" that is not related to work justifies discipline for renting videos to others, that same justification may be used to prevent a police officer's personal use of sexually explicit videos. The citizen could argue that the public response could lead to a disruption of the police department. In addition, it is not inconceivable that plaintiffs and defendants might attempt to apply this argument in cases of assembly or religion in which a police officer attends a meeting of a religious or other group to which some members of the public object. There are strong first amendment values in the free exercise of religion and in the freedom of assembly which could be severely restricted if the external objectors' justification were allowed to be applied in these cases.

We conclude that plaintiffs' interest in engaging in the speech at issue outweighs defendants' interest in preventing it. Because the *Pickering* balance tips in favor of plaintiffs, we hold that Chief Munger violated their right to freedom of speech and press by prohibiting them from selling or renting sexually explicit video tapes and by reprimanding them for engaging in that activity.

### C. Liability of Chief Munger

■ Under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The qualified immunity standard articulated above focuses on the objective legal reasonableness of an official's conduct measured against clearly established law at the time he acted. *Id.* In order to strip an official of qualified immunity for violating an individual's constitutional right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Although Chief Munger is guilty of violating the plaintiffs' constitutional rights, he is still entitled to summary judgment on plaintiffs' freedom of speech claim because, as a matter of law, he enjoys qualified immunity with respect to that issue. Qualified immunity insulates Chief Munger from liability with respect to this claim because, when he acted, the law regarding the regulation of police officers' off-duty speech in this context was not clearly established. The discussion above indicates the uncertainty of the issue under prior law. Chief Munger "could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Therefore, we affirm the trial court's award of summary judgment to Chief Munger and its denial of summary judgment to plaintiffs with re-

---

9. This case does not involve negative reactions or potential internal disruption by fellow police officers or others inside the police department. We express no opinion as to the outcome of the "heckler's veto" argument in such a case.

**1568**

spect to the damage claim against him on this issue.

### D. Liability of the City of Colorado Springs

■ If an employee inflicts a constitutional injury when executing "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, ... the government as an entity is responsible under § 1983." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (rejecting *respondeat superior* as theory of municipal liability).[10] Municipal liability attaches only to "acts which the municipality has officially sanctioned or ordered," *Pembaur*, 475 U.S. at 480, 106 S.Ct. at 1298, and only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1300.[11]

■ The final policymaker determination is a question of state law. *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300. We note at the outset that the City admitted that "[a]t all times pertinent hereto, the City of Colorado Springs has delegated to [Chief Munger] final authority to issue reprimands to Colorado Springs police officers." Complaint, ¶ 49; and Answer of City of Colorado Springs, ¶ 26 (admitting allegation of ¶ 49 of Complaint); Response to Plaintiffs' Request for Admissions, ¶ 2 (admitting City delegated to Chief authority to set policy regarding discipline imposed on officers for violations of departmental rules and regulations, although such authority was reviewable). This admission effectively disposes of the municipal liability issue because it all but flatly states that Chief Munger was the final policymaker

with respect to issuing written reprimands in the department.

In spite of this admission, the City argues that it is not liable because Chief Munger's authority to set policy regarding departmental discipline is always reviewable by the City Manager and the City Council. *See* Response to Plaintiffs' Request for Admissions, ¶ 2. The City argues that it has not delegated *final* authority to the Chief because the City Manager has *general* management and supervision of all matters relating to the police department, its subordinate officers and employees. Mun. Code, Ch. 2, Art. 6, § 2–6–103. He also has "the power to set aside any action taken by the department head and ... may supercede any department head in the functions of his position." Mun.Code, Ch. 1, Art. 4, § 1–4–205. The City also argues that it has not delegated final authority to Chief Munger because "[t]he rules of the Civil Service Commission ... govern disciplinary matters relative to uniformed personnel [*e.g.*, review by City Council] except as otherwise provided by charter or ordinance." Mun.Code, Ch. 2, Art. 6, § 2–6–105.

Although it appears at first blush that the Chief does not have final policymaking authority because the City Manager and City Council may review his decisions, we believe that he does have final authority for two reasons. First, we believe that specific police department sections in the code truly govern the issue. Although the City Manager has *general* management and supervision over the department, § 2–6–103, the Chief of Police has *direct* management and supervision. Mun.Code, Ch. 2, Art. 6, § 2–6–104. In addition, under § 2–6–104 the Chief is "responsible for the discipline, good order and proper conduct of the Department, [and] the enforcement of all laws, ordinances and regulations per-

---

**10.** "Official policy" under § 1983 includes custom, *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36, and usage, *Pembaur v. Cincinnati*, 475 U.S. 469, 481 n. 10, 106 S.Ct. 1292, 1299 n. 10, 89 L.Ed.2d 452 (1986).

**11.** The fact that Chief Munger is immune from liability for his actions is irrelevant to the liabil-

ity of the City. We found that Chief Munger violated the plaintiffs' constitutional rights. The City cannot claim immunity under *Harlow* because it is not a "government official." Therefore, the City is liable, and the only remaining question is whether it is immune from liability under another theory.

taining thereto." Mun.Code, Ch. 2, Art. 6, § 2-6-104.

Secondly, we find the City's review argument unpersuasive. Sections 1-4-205, 2-6-103 and 2-6-105, *supra*, certainly do not create mandatory or even any formal review of departmental actions. In fact, the City admitted that there is no provision for administrative review of written reprimands in the City's procedural manual. *See* Response to Plaintiffs' Request for Admissions, ¶ 4. Although the City argues that departmental decisions *may* ultimately be reviewed by the City Manager or City Council, for all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review is illusory. Thus, even if we based our analysis on Colorado Springs' municipal code, we would hold that Chief Munger has final authority to establish policy with respect to departmental reprimands.

In our judgment, when Chief Munger issued the reprimands against plaintiffs, he acted as the official "responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483-84, 106 S.Ct. at 1300. Therefore, Chief Munger's unconstitutional reprimand may be imputed to the City for purposes of municipal liability. We reverse the trial court's grant of summary judgment to the City on this issue, grant summary judgment to plaintiffs, and remand to the trial court for a determination of remedies on their free speech claim against the City and, to the extent they seek injunctive relief, against Chief Munger as well.

12. C 1300. STANDARDS OF CONDUCT—GENERAL RULES: Members of a Police Department are highly visible representatives of government and are entrusted with the responsibility of ensuring the safety and well-being of the community as well as the delivery of police services. Since the functions of a Police Department have a major impact upon the community, standards of conduct for police personnel are higher than standards applied to the general public. In this regard Department Members will conduct themselves in a manner which does not bring discredit upon individuals, the Department, the City of Colorado Springs or the community.

13. C 1301.25. CONDUCT UNBECOMING A POLICE OFFICER: Members of the Colorado

## II. Void for Vagueness Claim

Plaintiffs contend that departmental regulations C 1300 [12] and C 1301.25 [13] are unconstitutionally vague. A regulation [14] is vague on its face when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The rule should comport with a "rough idea of fairness ... and provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

We hold that regulations C 1300 and C 1301.25 are not vague on their face. For that purpose, we adopt the reasoning of the Colorado Court of Appeals in *Puzick v. City of Colorado Springs*, 680 P.2d 1283 (Colo.App.1983) (addressing constitutionality of C1301.25). In *Puzick*, the court reasoned that:

> While it is true that this rule is not precise in delineating proscribed conduct or in positing a standard by which a police officer can evaluate the propriety of proposed conduct, broad rules such as ones condemning "conduct unbecoming an officer" or, as here, conduct impairing the operation or efficiency of the department or bringing the department into disrepute, have been generally upheld against challenges of facial vagueness....

Springs Police Department shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming a police officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a Member of the Department, or that which impairs the operation or efficiency of the Department or Member.

14. *See Vorbeck v. Schnicker*, 660 F.2d 1260, 1262 (8th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982) (prohibition against vagueness applies to administrative regulations as well as statutes).

Capacious phrases such as the one included in the Colorado Springs Manual are unavoidable. They nevertheless provide adequate notice to police officers that their conduct, both on and off duty, must meet a high standard of comportment. . . .

As Judge Leventhal of the District of Columbia Circuit noted in *Meehan v. Macy*, 392 F.2d 822, 835 (D.C.Cir.1968), *modified*, 425 F.2d 469, *aff'd*, 425 F.2d 472 (1969):

> "[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'"

*Id.* at 1286 (citations omitted).

Thus, we hold that the statutes are not vague on their face. The remaining vagueness issue is whether the statute is vague as applied. The trial court's decision on vagueness appears to be based on its conclusion that plaintiffs' speech was not protected. In light of our reversal of this finding, we remand for consideration of whether the statute is vague as applied and the attendant issues of immunity.

### III. Right to Privacy Claim

 Plaintiffs contend that the Chief's disclosure to the media of the reprimands he issued against them violated their constitutional right to privacy.[15] The trial court granted summary judgment on this issue because it believed that the facts in the record did not support a claim for relief on this ground. We affirm.

The Supreme Court has recognized that the constitutional right to privacy protects an individual's interest in preventing disclosure by the government of personal matters. *See Whalen v. Roe*, 429 U.S. 589, 599 & n. 24, 97 S.Ct. 869, 876 & n. 24, 51 L.Ed.2d 64 (1977). In *Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432 (10th Cir.1981), we adopted the Colora-

do test for determining whether information contained in personnel files is of such a highly personal or sensitive nature that it falls within the zone of confidentiality. "In applying this test the court must consider, (1) if the party asserting the right has a legitimate expectation of privacy, (2) if disclosure serves a compelling state interest, and (3) if disclosure can be made in the least intrusive manner." *Id.* at 435; *see Martinelli v. District Court in and for the City and County of Denver*, 199 Colo. 163, 612 P.2d 1083, 1091 (1980).

The plaintiffs' right to privacy claim can be disposed of under the first prong of the *Martinelli* test. Our cases provide no absolute right to privacy in the contents of personnel files. Only highly personal information is protected. In *Lichtenstein* this court held that police internal investigation files were not protected by the right to privacy when the "documents related simply to the officers' work as police officers." *Lichtenstein*, 660 F.2d at 435. The court upheld the *Martinelli* definition of privacy rights which held that data in files "which is not of a highly personal or sensitive nature may not fall within the zone of confidentiality." *Id.*

In this case Chief Munger revealed two facts from the internal investigation file to the news media. The Chief told the media (1) that the plaintiffs had been reprimanded, and (2) that the reason for the reprimand was their ownership of the video store. Clearly the reason for the reprimand, the part ownership of the video store, was public information. The plaintiffs often worked in the store themselves renting videos to the public. They were even observed telling some customers that they were police officers. Thus, the plaintiffs could have no expectation that their ownership of the video store would be kept private.

We also hold that the fact that the reprimands were issued was not information in which the plaintiffs had a legitimate expectation of confidentiality. Although the rep-

---

**15.** The federal constitutional right to privacy is protected by the due process clause of the fourteenth amendment. *See Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973).

rimands were based on off-duty conduct, we have already concluded that this conduct itself was public information. In addition, the reprimands were issued because the off-duty conduct was believed to reflect on the officers' fitness as officers and to undermine public confidence in the department. Thus, the fact that the reprimands were issued "related simply to the officers' work as police officers." *Lichtenstein,* 660 F.2d at 435. We are unwilling to hold that a reprimand of a public employee is of a highly personal nature and creates a constitutional expectation of privacy.

Plaintiffs point to city policy, regulation, and custom which states that information in personnel files will be kept confidential.[16] However, under our precedents these statutes and policies do not by themselves create a constitutional privacy right. In *Mangels v. Pena,* 789 F.2d 836 (10th Cir.1986), fire fighters signed forms prior to making statements to police internal investigators which contained assurances of confidentiality. However, this court held that

> [a]ny limited assurances of confidentiality offered by Denver officials to the Mangels do not make a difference in this case. Rights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution. The legitimacy of individual expectations of confidentiality must arise from the personal quality of any materials which the state possesses. Allegations of a failure on the part of government officials to abide by their own assurances of confidentiality will not suffice to state a claim. Any disclosed information must itself warrant protection under constitutional standards.

*Id.* at 839 (citations and footnotes omitted). The presence of privacy statutes and regulations may inform our judgment concerning the scope of the constitutional right to privacy. However, such local acts, standing alone, fall far short of the kind of proof necessary to establish a broadly recognized, reasonable expectation of privacy which has been identified by precedent. Thus, plaintiffs cannot rely on state statutes to create a federal constitutional claim. However, our holding does not affect the plaintiffs' right to seek redress for a violation of the City's policies under any causes of action created on the state level. No claim of such a cause of action is before us.

Since we hold that the information released by Chief Munger is not of a highly personal nature, we deny the plaintiffs' privacy claim. We affirm the trial court's grant of summary judgment to defendants Munger and the City on this issue.

IV. Deprivation of Liberty Claim

Plaintiffs contend that defendants deprived them of liberty without due process of law by releasing information about their reprimands to the media. A public employee enjoys two interests protected under the liberty prong of the fourteenth amendment's due process clause: (1) an interest in his good name, reputation, honor and integrity, and (2) an interest in other employment opportunities. *Miller v. City of Mission, Kan.,* 705 F.2d 368, 373 (10th Cir.1983). In order to show deprivation of a liberty interest under section 1983, plaintiffs must first show that the government's action stigmatized or otherwise damaged their reputations. *See McGhee v. Draper,* 639 F.2d 639, 642–43 (10th Cir.1981). To do so, they must show that the government published false and stigmatizing information about them in connection with the adverse action taken against them. *See Asbill v. Housing Auth. of Choctaw Nation,* 726 F.2d 1499, 1503 (10th Cir.1984).

At this point, we can easily dispose of the liberty deprivation issue. None of the statements made by Chief Munger to

---

16. *See* Personal Privacy policy adopted by City Council of Colorado Springs on July 9, 1985; City's Answer Brief at 3 n. 1; Complaint, paragraph 40 (alleging personnel files of public employees are confidential and may not be disclosed to the public absent consent by the employee) and paragraph 41 (alleging that under municipal regulation and custom, internal affairs investigations and personnel files are confidential); City's Answer, paragraphs 20, 21 (admitting allegations of paragraphs 40, 41 but stating regulations and customs were not violated); and Chief Munger's Answer at paragraphs 22, 23 (same).

the media about plaintiffs were false—plaintiffs subsequently received letters of reprimand for their involvement in a video tape business.[17] The Chief simply verified most of the underlying facts, many of which had already been verified by one of the plaintiffs. His comments which were not true facts were merely opinion and did not contain personal information.[18] Because plaintiffs did not show that any of Chief Munger's statements to the media were false, they have failed to support a claim for deprivation of liberty under section 1983. Therefore, defendants are entitled to judgment as a matter of law, and we affirm the trial court's grant of summary judgment to them.

## V. Retaliatory Demotion Claim

 Officer Flanagan alleges that he was demoted[19] from the position of deputy chief as a result of his participation in plaintiffs' video rental business and in retaliation for filing this lawsuit. With respect to this claim, several genuine issues of material fact exist. First, a factual dispute exists with respect to the nature of a deputy chief's position, for instance, whether it is merely titular, or whether appointment to the position is a formal promotion.

Secondly, a fundamental factual dispute exists with regard to Chief Munger's reason for demoting or failing to reappoint plaintiff. Plaintiff argues that he was demoted for engaging in protected activity. Defendants, on the other hand, argue that deputy chiefs "serve at the will and pleasure of the Chief of Police," Mun.Code, Ch. 2, Art. 6, § 2–6–102B, and that Chief Munger decided not to reappoint plaintiff based entirely on professional considerations. Because these genuine issues of fact exist, the trial court improperly granted summary judgment on plaintiff's claims. There-

fore, we reverse and remand for further proceedings on these issues.[20]

## VI. Conclusion

On plaintiffs' first amendment claim, we hold that Chief Munger violated plaintiffs' right to freedom of speech. However, because of the Chief's immunity to liability under *Harlow*, we affirm the trial court's grant of summary judgment to Chief Munger and its denial of summary judgment to plaintiffs with respect to him on the damage claim. We reverse the trial court's grant of summary judgment to the City on the free speech issue because a City employee violated plaintiffs' right to free speech, while conceding that the speech was the substantial motivating factor for the reprimand. The City lacked immunity under *Monell*, and thus we grant summary judgment for plaintiffs against the City and remand for a determination of damages and consideration of the equitable relief requested.

On plaintiffs' right to privacy claim, we affirm the trial court's grant of summary judgment to the City and to Chief Munger. We affirm the trial court's grant of summary judgment on plaintiffs' facial void for vagueness claim and remand on the void for vagueness as applied issue. We also affirm the trial court's grant of summary judgment to defendants on plaintiffs' deprivation of liberty claim. Finally, we reverse and remand on Officer Flanagan's retaliatory demotion claims.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**17.** The fact that we have held that Chief Munger's reprimand of plaintiffs was unconstitutional does not alter the fact that he did so. Therefore, his statement that he would issue written reprimands to plaintiffs was true.

**18.** For example, Chief Munger commented that plaintiffs' activity risked tarnishing the image of the Police Department.

**19.** Defendants characterize this action as a failure to reappoint.

**20.** We do not address the issue of *Harlow* immunity with respect to Chief Munger or the City's liability under *Monell* with respect to these claims because neither defendant raised these defenses below or on appeal, and thus we lack the necessary facts. We leave these determinations to the trial court on remand.