Christie L. ROTHSCHILD and Sanford
E. Morris, Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY
OF BUFFALO; David B. Kelly, Indi-
vidually and as President of the Board
of Education of the City of Buffalo,
New York; and Eugene T. Reville, Indi-
vidually and as Superintendent of
Schools for the City of Buffalo, New
York, Defendants.

No. CIV–80–933C.

United States District Court,
W.D. New York.

Dec. 5, 1991.

Brown & Kelly (Kevin A. Ricotta, of counsel), Buffalo, N.Y., for plaintiffs.

National Educ. Ass'n of New York (Robert W. Klingensmith, Jr., of counsel), Buffalo, N.Y., for plaintiff Christie L. Rothschild.

Connors & Vilardo (Terrence M. Connors and James J. Duane, of counsel), Buffalo, N.Y., for defendant David B. Kelly.

Aubrey V. McCutcheon, Jr., Detroit, Mich., for defendants Board of Educ. and

Superintendent of Schools for City of Buffalo.

R. Peter Morrow, III, Acting Corp. counsel for City of Buffalo, Buffalo, N.Y., for defendant Board of Educ.

## BACKGROUND

CURTIN, District Judge.

During the spring and summer of 1980, plaintiffs Christie Rothschild and Sanford Morris participated in the production of a videotape film at a Buffalo public school where they both held teaching positions, and both were disciplined for their involvement in the project. Rothschild, who was a temporary, untenured teacher at the time,[1] was never rehired by defendant Board of Education ("Board"). Morris, who held a tenured teaching position, was not discharged, but he alleges that after initially being suspended he was "removed from his position as a teacher in the field of communications." Item 35 at ¶ 27.

Invoking the court's jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343, Rothschild claims that the defendants' actions violated her rights under the First Amendment to the United States Constitution.[2] In addition, both plaintiffs have asserted several claims under New York State law based on certain statements and actions by defendants Eugene Reville and David Kelly, who at all relevant times were, respectively, the Superintendent of Schools and the President of the Board.[3]

The court previously granted in part and denied in part the defendants' motion for summary judgment with respect to the defamation claim embraced within the second cause of action, but denied the motion with respect to the balance of the plaintiffs' claims. *See* Item 46. The court subsequently conducted a nonjury trial, after which the parties submitted briefs and proposed findings and then presented closing arguments. The following constitutes the court's findings of fact and conclusions of law.

## FACTS

Starting in approximately the early spring of 1980, the plaintiffs took part in the production of a film entitled *Strike A Match* at the Buffalo Academy for the Visual and Performing Arts ("Academy"). The Academy is part of the Magnet School Program of the Buffalo Public School System ("BPSS"), and it is attended by students in the fifth through twelfth grades. At that time, Rothschild was teaching theatre arts, and Morris taught in and headed the Academy's telecommunications department. Both had received consistently favorable job evaluations throughout their careers in general and during their service at the Academy in particular. The author of the film's script was Gerald Marchette, a western New York playwright, producer, and director. Marchette hoped to sell the script to Columbia Pictures through an intermediary he knew there.

Rothschild had a lead acting role in the project, but she played no part in the drafting of the screenplay. Both prior to and during her teaching career, Rothschild had been involved in theatre, and she had previously worked with Marchette before he approached her about performing in *Strike A*

1. A temporary teaching position is one that is renewed on a yearly basis at the discretion of the Board of Education. A person holding a temporary position does not accrue tenure rights.

2. Morris has not made a First Amendment claim.

3. Reville died after this case was submitted for decision. The plaintiffs brought suit against him in both his personal and official capacities. Insofar as Rothschild's First Amendment claim against Reville in his official capacity is concerned, Reville's successor is automatically substituted as a party pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure. *See Kentucky v. Graham*, 473 U.S. 159, 166 n. 11, 105 S.Ct. 3099, 3105 n. 11, 87 L.Ed.2d 114 (1985). *See also* FED.R.CIV.P. 25(d)(2).

The record does not contain a suggestion of death pursuant to Rule 25(a)(1). Although the plaintiffs have yet to indicate a desire to proceed against Reville's estate to the extent that their personal-capacity claims survive his death, *see Grandbouche v. Lovell*, 913 F.2d 835, 836–37 (10th Cir.1990) (ninety-day limitations period contained in Rule 25(a)(1) is not triggered until formal suggestion of death is made on the record), the court will rule on those claims.

*Match.* Morris became involved as the project's technical producer after he was recommended to Marchette by Rothschild, and he also acted in one scene.

Prior to beginning the project with Marchette, Morris obtained oral permission to use the Academy's premises and equipment from the school's principal, Philip Lafornara, who died prior to the trial. Morris testified that he told Lafornara he had been approached by a local writer who hoped to produce a pilot film about a satirical murder mystery that could be sold to a major film company. He explained to Lafornara that he believed selling the pilot could enhance the prestige of the Academy and, hopefully, lead to job opportunities for graduating students by establishing a link between the Academy and a major studio. He also told Lafornara that, if the pilot commanded a sufficient price, the participants in the project planned to establish a scholarship fund for Academy students. According to Morris, Lafornara "was thrilled" about the project. Transcript, Item 71 (Volume III), at pp. 318, 345–47. *See also* Trial Exhibit 2 at p. 117. Morris also testified that he often had contact with Lafornara during the course of the filming—which included visits to the studio by Lafornara—and that Lafornara would always ask him how the project was progressing. In addition, Morris related that once during the filming an assistant principal questioned him about whether he had received permission for the project, and that Lafornara subsequently told the assistant that he had, in fact, given his permission. *Id.* at pp. 318–19, 359–60. After receiving permission from Lafornara, Morris agreed to produce the film from Marchette's script.

Rothschild testified that after the project had begun, she confirmed with Lafornara that he had given permission for use of the Academy's facilities. *See* Transcript, Item 70 (Volume II), at pp. 267–69. On one occasion, she was questioned about authorization for the undertaking by the same assistant principal who had questioned Morris, at which point she immediately sought out Lafornara and verified that the assistant was simply unaware that permission had been given. *Id.* at 274. She also testified that Lafornara at one point asked her how the project was progressing, and at another told her how pleased he was about it. *Id.* at 267–69. In addition, Rothschild related that she was the one who had originally suggested the creation a scholarship fund after being approached by Marchette about participating in the project. *Id.* at pp. 269–70.

It is apparent from the court's review of the transcript of Lafornara's testimony at Morris's tenure hearing the following year that he was not aware of the precise nature of the project at the time he gave Morris permission to use the school's facilities. *See* Trial Exhibit 2 at pp. 95–122. Indeed, Morris testified that he could not have told Lafornara about the content of the screenplay because he himself did not know it. *See* Transcript, Item 71 (Volume III), at pp. 344–45. It seems clear from his tenure-hearing testimony and the evidence at trial, however, that Lafornara did realize that Morris and the others were contemplating a private, commercial venture.

Two high-school seniors, at least one of whom was eighteen years old, were also involved in the filming, and both had obtained permission from their parents before participating in the production. Both students assisted Morris with the camera work, and one of them also played a minor acting role in the film. *See* Transcript, Item 70 (Volume II), at pp. 270–73; Item 71 (Volume III), at pp. 319–20, 344, 347–52. Steven Glassman, another teacher at the Academy, also had a small role in the production.

According to Marchette, he did not intend to make a complete movie; rather, he merely hoped to demonstrate, in his words, "the visual possibilities" of a detective story. Transcript, Item 69 (Volume I), at p. 35. For that reason, he did not think it was important that there be continuity in the film or that it be easy to follow for the people viewing it. He conceded that the videotape had no easily discernible plot, and maintained that this was done intentionally to prevent anyone from copying his ideas. His goal was to get the attention of

potentially interested parties in the movie industry who would, in turn, have to rely on him for an explanation of what was essentially a pilot or preview for a film. Marchette hoped that, once interested, they would want him to pursue further development of the screenplay. Marchette testified that the film was not intended to depict the BPSS in any way. Transcript, Item 69 (Volume I), at p. 36.

Without question, Marchette's efforts to obscure the point of the film were a complete success. The film is comprised of isolated scenes from his screenplay depicting the fictional adventures of a high-school teacher. Although it is undisputed that the film is not pornographic, there is much vulgar language, such as "fucked up," "little bastard," "shithead," "son of a bitch," "tough shit," and "Goddamned." There are also scenes of illegal drug use by high-school students and of persons in various states of partial undress. In one scene approximately halfway through the videotape, which the parties refer to as the "body-shop scene," Rothschild's blouse and skirt are forcibly ripped from her body, leaving her exposed in her underwear. During the same scene, one of the students in the story—who was not one of the Academy students participating in the project, *see* Transcript, Item 70 (Volume II), at pp. 271–72—is shown writhing on a mat in bikini briefs while Rothschild tells him, "Don't just lay there playing with yourself." In explaining the plot, Marchette testified that the participants in this scene were supposedly engaged in the production of pornographic films. Transcript, Item 69 (Volume I), at p. 51. At trial, Rothschild acknowledged that the film had an adult theme, and Morris acknowledged that the content of the film was inappropriate for children.

The videotape was made with school equipment, but all work was done during nonschool hours at the Academy. The shooting of the film typically began on school grounds about ninety minutes after the students had been dismissed for the

day. Although the plaintiffs concede that some students may have remained at the school on a given day because of extracurricular activities, they maintain that there were no students in the area of the Academy where the filming was going forward. *See* Transcript, Item 71 (Volume III), at pp. 354–55. The plaintiffs also maintain that, in addition to never being intended to portray or to comment upon the BPSS, the film was not to be shown to the public or to students at the Academy. *See* Transcript, Item 70 (Volume II), at p. 285; Item 71 (Volume III), at pp. 325–26, 329–331, 352–53.

The events leading to the plaintiffs' claims can be summarized briefly. On or about July 10, 1980, a clerk typist saw a portion of the videotape while it was being worked on at the Academy.[4] Finding the film offensive, she attempted to contact one or more Board officials later that day. By that time, Lafornara had retired from the school system. By the following morning, Reville, then Superintendent of the BPSS, had learned about the film. Although it is not clear whether the film was described to Reville as pornographic, *see* Transcript, Item 69 (Volume I), at pp. 121, 135–39; Transcript, Item 70 (Volume II), at pp. 157–60; Trial Exhibit 2 at pp. 90–91, 140, it is plain that it was in some way portrayed as extremely offensive. Upon hearing of the videotape, Reville ordered that it be seized.

Later that morning, the videotape was shown in a closed-door meeting that included Reville and several other school officials, the plaintiffs, Marchette, and an attorney from the Corporation Counsel's Office named William Carey. According to the plaintiffs, Reville was told prior to the tape being played that it was never meant to be shown to anyone other than movie executives. Upon viewing the so-called body-shop scene, Reville became very angry, slamming his hand against a table and ordering that the videotape be stopped. Reville told Rothschild and Morris that

---

**4.** The record is not clear as to whether the clerk typist inadvertently entered the studio or was invited by Glassman to watch the videotape.

*See* Transcript, Item 69 (Volume I), at pp. 113–20.

they were in great "trouble," and then left the room without watching the rest of the film.[5] Reville viewed more of the videotape in a second meeting that afternoon that included Kelly and a number of other Board members. Transcript, Item 70 (Volume II), at pp. 157–65, 275–78; Item 71 (Volume III), at pp. 324–28. After watching the film, the participants in the meeting discussed, in Kelly's words, "our feelings around [sic] the film." Kelly testified at trial that he told the others he believed the film "was not an appropriate product of the school district," and that he and the others "felt that we should make a decision around the merits of this product." Transcript, Item 70 (Volume II), at p. 239. It is undisputed that neither Reville nor Kelly attempted to contact either plaintiff after the initial viewing of the videotape that morning.

Later that evening, Assistant Superintendent Morris Raiken telephoned Morris and informed him that he had been suspended. Transcript, Item 70 (Volume II), at pp. 157–65, 179–81; Item 71 (Volume III), at p. 328. Raiken also called Rothschild that evening, but the record is not as clear with regard to what she was told. Reville consistently testified at trial that Rothschild had been "suspended" that night. According to Rothschild, however, when Raiken called and told her that she had been suspended, she responded that she could not be suspended because she was a temporary teacher. She testified that Raiken replied by telling her that she should consider herself fired. Transcript, Item 70 (Volume II), at pp. 181, 278–79. *See also id.* at pp. 157–58.

In a letter to Morris dated July 16, 1980, Reville confirmed that he had suspended Morris, and informed him that the full Board would consider the matter at its first regularly scheduled meeting the following September. *See* Trial Exhibit 9. In a subsequent letter to the Board, Assistant Corporation Counsel Carey, in describing the events of July 11, stated that Reville had "notified Mr. Morris that he was suspended

and Ms. Rothschild that her services would no longer be required by the School System." Trial Exhibit 24 at p. 2. *See* Transcript, Item 71 (Volume III), at p. 451. Although the record does not indicate whether Rothschild also received a letter from Reville, the defendants have not disputed that the decision as to what action should be taken against her was also made by Reville.

Reville testified that the actions taken against both Morris and Rothschild were based on the recommendation of the Corporation Counsel, and that he also conferred with and relied upon the advice of the Corporation Counsel for all subsequent actions he took regarding the matter. Transcript, Item 71 (Volume III), at pp. 444, 448–49. *See also* Trial Exhibit 9.

Over the next several weeks, a series of news stories surfaced in the local media that included the allegedly defamatory statements by Reville and Kelly that remain in the case. Specifically, the plaintiffs allege the following:

1) On July 22, 1980, Kelly was reported in a local newspaper to have said: "[Q]uestions arise over whether it is the type of film which children should be exposed to."

2) On July 22, 1980, Reville was quoted by a local television reporter as having said: "We think it is an offensive film. We belief [sic] that school equipment and school facilities were used to put together a film which is not of the type that we believe should be produced for a school, in a school or about a school."

3) On July 22, 1980, Reville was reported in a local newspaper to have said: "The film ... contains strong language, sexual innuendos and double entendres of the sort that should have no connection with a school housing fifth graders." The same statement was again quoted in a newspaper article on August 26, 1980. *See* Item 35 at ¶ 21; Transcript, Item 70 (Volume II), at pp. 244–45. Reville testified that he never made the statement attributed to him by the two newspaper arti-

---

**5.** At Morris's tenure hearing, which was held on February 6, 1981, Reville testified that he con-

sidered that part of the video to be "particularly offensive." *See* Trial Exhibit 2 at p. 131.

cles, asserting that, in fact, it had been made by Assistant Corporation Counsel Carey. Transcript, Item 70 (Volume II), at pp. 183–88.

At about the time these statements began appearing in the local media, the videotape was delivered to the Erie County District Attorney's Office by a representative of the Corporation Counsel's Office for a determination as to whether it was pornographic. Reville testified that this was done because the Corporation Counsel told him that neither he nor Reville was qualified to make such a decision. *See* Transcript, Item 70 (Volume II), at pp. 150–51, 205–07; Item 71 (Volume III), at pp. 447–48; Trial Exhibit 24 at p. 2. For their part, the plaintiffs presented evidence to support their claim that the defendants referred the tape to the District Attorney's Office only to avoid allegations of a cover-up. *See, e.g.,* Transcript, Item 70 (Volume II), at pp. 217–21; Item 71 at 372, 376–77, 393–94. In any event, the District Attorney concluded that the film was not pornographic. *See* Trial Exhibit 2 at pp. 141–42.

The Board did not rehire Rothschild in the fall,[6] and she never again worked in the BPSS.[7] The Board voted to seek Morris's discharge, and an administrative tenure hearing was then conducted pursuant to New York Education Law § 3020-a. *See* Trial Exhibit 2. Morris was initially cleared of any wrongdoing after the hearing, but the hearing panel's decision was subsequently annulled by the Commissioner of Education. Finding Morris's use of a public school's building and equipment for private commercial purposes to be violative of Article VIII, § 1 of the New York State Constitution and § 414 of the New York Education Law, the Commissioner directed that Morris could be fined up to $1,000.

*See In the Matter of the appeal of the Bd. of Educ. of the City Sch. Dist. of the City of Buffalo,* 21 Ed. Dep't Rep. 585 (1982). Morris eventually returned to teaching in the BPSS, although it is not clear whether the Board ever collected a fine from him. *See* Transcript, Item 71 (Volume III), at pp. 334–39, 453. Glassman was not disciplined in any way for his participation in the production.

Rothschild and Morris have alleged several claims against the defendants. First, Rothschild alleges that the content of the videotape was at least a substantial factor in what she refers to as her "firing" in July, 1980, and the Board's eventual decision not to offer her another temporary teaching position. In this regard, Rothschild asserts that as of the time she was contacted by Assistant Superintendent Raiken in July, 1980, she had met all statutory and contractual requirements for rehiring, and the Board has not suggested otherwise.[8] She also argues that Reville and Kelly were responsible for the actions taken against her. Rothschild contends that the defendants thus penalized her for exercising her First Amendment right to freedom of expression. Second, both plaintiffs allege that they were defamed by the comments made by Reville and Kelly in the presence of news reporters that were subsequently printed or otherwise published in the media. Third, the plaintiffs claim that Reville and Kelly were responsible for turning the film over to the District Attorney's Office for an investigation of whether the film was pornographic knowing that there was no justification for doing so. The plaintiffs claim that the defendants' actions in this regard constituted a *prima facie* tort under New York law. Fourth, the plaintiffs claim that, in having the vid-

---

6. In the complaint, Rothschild asserts that "[a]t the Board of Education meeting held on or about August 27, 1980, defendants Kelly and Reville caused the Board of Education to terminate the services of the plaintiff because of her 'acting' and taking part in the film." Item 35 at ¶ 12. Although the trial record does not contain evidence of such a meeting, it is undisputed that the Board did not rehire Rothschild in the fall because of her participation in the making of the film.

7. As of July, 1980, Rothschild had been a temporary teacher for nine years in the BPSS.

8. Article XII(D) of the collective-bargaining agreement between the Board and the Buffalo Teachers Federation provided that "temporary teachers of experience and satisfactory service shall be given preference over other temporary teachers for employment in subsequent school years."

eotape delivered to the District Attorney's Office, Reville and Kelly falsely communicated to the public-at-large that the plaintiffs had made a pornographic film, and that in doing so they libeled the plaintiffs. Finally, the plaintiffs claim that Reville's and Kelly's actions in turning the videotape over to the District Attorney's Office also renders them liable for the intentional infliction of emotional distress.

## DISCUSSION

### A) *The First Amendment Claim*

The defendants argue that Rothschild's appearance in the film was not even expressive speech, much less a comment upon a matter of public concern, and that it is, therefore, entitled to no constitutional protection. In addition, the defendants contend that even if this court were to find that Rothschild's activities in connection with the film amounted to constitutionally protected speech, "there is not the slightest evidence that she was sanctioned because of the content of those ideas or expressions." Item 75 at 14. Instead, the defendants contend that Rothschild was terminated for three reasons that are unrelated to Rothschild's First Amendment rights.

First, the defendants contend that their refusal to rehire Rothschild was justified because the film was unlawfully produced for private commercial purposes with publicly owned school equipment. In support of this argument, the defendants cite the decision of the State Education Commissioner, who found that the use of Academy equipment for the production of the film violated New York constitutional and statutory law.

Second, the defendants argue that to the extent that their reaction *was* based on what they saw in the film, "their objection was not to the content of the message being expressed (if any), but rather the vulgar and offensive modes of expression that were employed in a film made in front of students of the school." Item 75 at 15.

Third, the defendants contend that even if the film had not been made in the presence of students, they were entitled to im-pose sanctions against Rothschild "as a means of repudiating the unjustified and undesirable representations by plaintiffs that the content of this film had been authorized by the Academy and by the City School System." *Id.* at 17. According to the defendants, if they had done nothing after learning of the videotape, "it is undisputed that this film would have been unjustifiably passed off as a representative sample of the work of the Academy, at least in the minds of several prominent figures in the film industry." *Id.* at 18.

Citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977), the defendants argue that even if Rothschild demonstrates that they were, in fact, improperly motivated by their objection to the content of the film, they should nonetheless prevail because the evidence establishes that they would have taken the same actions based on one or more of these three factors.

Finally, Reville and Kelly do not contest that they participated in and otherwise supported the actions taken against Rothschild. They argue, however, that, even if the court were to find that Rothschild's First Amendment rights had been violated, they are entitled to qualified immunity unless Rothschild can show that their actions were clearly illegal under the settled law at the time.

■ The United States Supreme Court has repeatedly and consistently held that a state may not discharge an employee on a ground that infringes the employee's constitutionally protected interest in freedom of expression under the First Amendment. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967). In reviewing allegations that a state has infringed a

teacher's First Amendment rights, the Supreme Court has attempted to strike

> a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Bd. of Educ.*, 391 U.S. at 568, 88 S.Ct. at 1734. The Court has explained that "[t]his balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin v. McPherson*, 483 U.S. at 384, 107 S.Ct. at 2897. It is designed to take proper account of both the First Amendment's "primary aim" of fully protecting speech on issues of public concern, and "the practical realities involved in the administration of a government office." *Connick v. Myers*, 461 U.S. at 154, 103 S.Ct. at 1694. In the context of public education, whether a teacher has a right to employment or re-employment by virtue of tenure or a contract is immaterial to his or her First Amendment claim. *Rankin v. McPherson*, 483 U.S. at 383–84, 107 S.Ct. at 2896–97; *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 283, 97 S.Ct. at 574; *Perry v. Sindermann*, 408 U.S. at 597–98, 92 S.Ct. at 2697–98. The Supreme Court has also made clear that speech does not lose its constitutional protection simply because it is expressed privately rather than publicly, *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413–14, 99 S.Ct. 693, 695–96, 58 L.Ed.2d 619 (1979); *Rankin v. McPherson*, 483 U.S. at 386 n. 11, 107 S.Ct. at 2898 n. 11, although "striking the *Pickering* balance in each context may involve different considerations." *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4.

In *Pickering v. Bd. of Educ.*, a teacher was terminated after a letter he had written was published in a local newspaper. In the letter, the teacher had criticized the way in which his local Board of Education and Superintendent of Schools had handled past proposals to raise new school revenue.

The Supreme Court rejected arguments that the teacher's termination was legal because his speech had impugned school officials and damaged their reputations, disrupted faculty discipline, or tended to foment controversy, conflict, and dissension in the school and among the residents of the district. Instead, the Court found that no showing had been made that the teacher's letter had had any negative impact on the operation of the schools "beyond its tendency to anger the Board." 391 U.S. at 571, 88 S.Ct. at 1736. Finding the issue of whether a school system requires additional funds to be a matter of legitimate public concern, the court held that the teacher's firing constituted a violation of his First Amendment rights. *Id.* The Court distinguished the situation in which

> a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts.

391 U.S. at 572, 88 S.Ct. at 1736.

This hypothetical fact pattern is similar to the facts confronted by the Supreme Court in *Connick v. Myers*, where the challenged speech was found to be essentially private in nature and threatening to the day-to-day working environment of a local District Attorney's Office. In that case, the Court found that the employee's firing did not violate the First Amendment. *Connick* involved an interoffice dispute between an assistant district attorney and her superiors. The majority opinion indicates that, after the plaintiff had expressed dissatisfaction with her transfer to a different section of the local criminal court, she prepared a questionnaire soliciting the views of her fellow staff members concerning office policies and morale, and distributed it during business hours. The plaintiff was fired for refusing to accept her transfer and for distributing the questionnaire, which was considered an act of insubordination. The plaintiff alleged that the dis-

missal constituted a violation of her First Amendment rights.

Mindful of the practical realities involved in the administration of a government office, the Supreme Court held that the plaintiff's First Amendment rights had not been violated, finding that the questionnaire at issue in the case was "most accurately characterized as an employee grievance concerning internal office policy." 461 U.S. at 154, 103 S.Ct. at 1694. In the process of reaching that conclusion, the Supreme Court attempted to distinguish *Pickering* and to provide further guidance to lower courts in employment cases implicating First Amendment rights.

Stating that speech concerning public issues is "more than self-expression," the Supreme Court noted that such speech occupies the " ' "highest rung of the hierarchy of First Amendment values," ' " and is entitled to special protection." 461 U.S. at 145, 103 S.Ct. at 1689 (citations omitted). The Supreme Court declared that:

> *Pickering,* its antecedents, and its progeny lead us to conclude that if Myers' [sic] questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy *wide latitude* in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

461 U.S. at 146–47, 103 S.Ct. at 1689–90 (emphasis added; footnote omitted). The court added that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record," 461 U.S. at 147–48, 103 S.Ct. at 1690–91, taking into account "the manner, time, and place" in which the disputed expression took place. 461 U.S. at 152, 103 S.Ct. at 1692.[9] The Court, however, qualified its holding:

> We do not suggest, however, that Myers' [sic] speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment.... We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead *as an employee* upon matters only *of personal interest,* absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. at 1690 (emphasis added). Significantly, the Court added that "[e]mployee speech which transpires entirely on the employee's own time, and in non-work areas of the office, bring [sic] different factors into the *Pickering* calculus, and might lead to a different conclusion." 461 U.S. at 153 n. 13, 103 S.Ct. at 1693 n. 13.

In *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Supreme Court applied the *Pickering/Connick* analysis to a case in which a public employee was fired for making a statement at work that was unrelated to her employment. *Rankin* involved a clerical employee in a county constable's office who, upon hearing a radio report of the 1981 assassination attempt on then-President Ronald Reagan, stated to a coworker: "[I]f they go for him again, I hope they get him." 483 U.S. at 381, 107 S.Ct. at 2895. The remark was overheard by a third employee who Rankin did not realize was in the room at the time. The comment was conveyed to the county constable, who then questioned Rankin. After Rankin admitted to having made the statement, she was fired. 483

---

**9.** Speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8.

U.S. at 381–82, 107 S.Ct. at 2895–96. Applying the *Pickering/Connick* framework, the Court concluded that Rankin's remark plainly dealt with a matter of public concern [10] and that her employer had not demonstrated any state interest that outweighed her First Amendment right to make the statement. 483 U.S. at 384–92, 107 S.Ct. at 2896–901.

Careful review of the Supreme Court cases cited above indicates that the *Pickering/Connick* analytical framework does not appear entirely suited to situations such as the one presented by the case at bar. Indeed, although both Rothschild and the defendants have attempted to fit the facts of this case within that framework, it is not at all clear that the criteria employed by the Supreme Court in those cases were meant to be rigidly applied to all cases involving adverse employment action taken against a public employee for speech the employee claims is protected by the First Amendment, particularly when the speech is off-duty artistic expression.

The awkwardness of attempting to apply the *Pickering/Connick* framework to all such situations is demonstrated by *Berger v. Battaglia,* 779 F.2d 992 (4th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986), a case heavily relied upon by the plaintiffs. *Berger* involved a Baltimore policeman who, during his off-duty hours, put on musical performances in which he appeared in blackface makeup and a black wig in the style of Al Jolson. The record indicates that the plaintiff never identified himself as a police officer during his performances, although the local media identified him as such. 779 F.2d at 993. He performed his act for several years, and his performance was in demand throughout the Baltimore community. Members of Baltimore's Black community eventually found the performances offensive, and, after a threat of public confrontation and

many complaints, the city's police department "feared that its community relations efforts would be undermined by widespread outrage over Berger's performances." *Id.* at 995. Berger, who subsequently continued to perform in blackface without incident or complaint, was ultimately stripped of his police powers and assigned to compiling crime statistics. The record in that case indicates that Berger's superiors had been well aware of his musical performances, including the Jolson impersonation, for several years prior to disciplining him; in fact, many of his superiors, including the deputy commissioner of the department, had seen him perform in clubs and taverns without ever complaining to him about the act. [11] Although Berger continued to perform in blackface following his reassignment, the defendants in that case conceded that, as of the time of trial, "there had been no significant impairment of the Department's relations with the black community," and no "disruption of the Department's internal harmony and operations resulting from any of Berger's performances in blackface." *Id.* at 996.

As with the dispute in the present case, the controversy presented by *Berger* "does not fit too neatly within the paradigmatic factual pattern out of which the '*Pickering* test' has developed." *Id.* at 997. As described by the United States Court of Appeals for the Fourth Circuit:

Here, at odds with the paradigmatic *Pickering* pattern, the employee speech was not criticism of or disagreement with governmental operations, and the governmental interest assertedly threatened by the speech was not internal employment relationships and operations. Instead the speech here was a form of artistic expression wholly unrelated in content to the public employer or its op-

---

**10.** Rankin's statement was preceded by a few brief remarks about the President's social-welfare policies, a fact that apparently affected the Supreme Court's determination regarding whether the statement was entitled to First Amendment protection. *See* 483 U.S. at 386, 107 S.Ct. at 2898.

**11.** Indeed, the record in that case indicates that Berger had reason to believe that his superiors affirmatively approved of the act. For example, on several occasions the deputy commissioner had introduced him to visitors as " 'the Department's Al Jolson,' " and another high-ranking officer had made it a practice of asking Berger to sing "Mammy" when he met him on the street. 779 F.2d at 994.

erations, and the threat it assertedly posed to employer interests was not internal disruption by the speech itself, but external disruption by third persons reacting to the speech.

*Id.* Acknowledging that employee speech whose content is "sheer entertainment" is not the type directly considered in the applicable Supreme Court precedent, the Fourth Circuit found that it is nonetheless entitled to First Amendment protection. The Fourth Circuit read the relevant Supreme Court precedent as standing for the principle that

> *all* public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely "personal concern" to the employee—most typically, a private personnel grievance. *See Connick*, 461 U.S. at 148–49 [103 S.Ct. at 1690–91].... The focus is therefore upon whether the "public" or the "community" is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a "private" matter between employer and employee.

*Id.* at 998–99 (emphasis added). Within this framework, the Fourth Circuit concluded that the policeman's performances

> clearly were not purely personal expressions of no concern to the community. Rather, they constituted speech upon a matter of obvious public interest to those considerable segments of the community who willingly attended and sometimes paid to see and hear them. That the content was sheer entertainment—presumably neutral as to any political or even social views—does not of course take them outside first amendment protection.

*Id.* at 999. Having determined that the policeman's performances thus constituted speech upon matters of public concern, the Fourth Circuit then determined that, under the *Pickering* balancing test, there was no sufficiently countervailing state interest that justified the officer's firing.

A significant shortcoming of this type of analysis is that it confuses the *Pickering/Connick* concern with the *content* of a public-employee's speech with the *form* of that speech. *See, e.g., Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4; *Rankin v. McPherson,* 483 U.S. at 384, 390, 107 S.Ct. at 2896, 2900; *Wren v. Spurlock,* 798 F.2d 1313, 1317 n. 1 (10th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987); *Wilson v. City of Littleton, Colo.,* 732 F.2d 765, 769 (10th Cir.1984). That approach also fails to recognize that the *Pickering/Connick* framework was developed in the context of public-employee speech that either occurred at or was directed toward the workplace. Thus the Supreme Court emphasized the importance of distinguishing between situations in which a public employee speaks *"as a citizen* upon matters of public concern," and those in which the employee speaks *"as an employee* upon matters only of personal interest." *Connick v. Myers,* 461 U.S. at 147, 103 S.Ct. at 1690 (emphasis added). *See Flanagan v. Munger,* 890 F.2d 1557, 1564 (10th Cir.1989) (The public-concern test was "intended to weed out speech by an employee speaking *as* an employee upon matters only of personal interest.") (emphasis added). By contrast, the present case involves artistic expression in the form of a film that, although dealing tangentially with Rothschild's workplace in the sense that the setting of the story is a fictional school, was made during non-school hours and was not intended to depict or to make a statement about the Academy or the BPSS. As observed by the Tenth Circuit, "since the court [in *Berger*] explained the factual differences and yet gave no reasoning for extending *Pickering,* it appears that the court applied the test because of the inertia of previous decisions applying *Pickering* in employment cases." *Id.* at 1564 n. 7. It appears that the better-reasoned approach is to avoid trying to force into the *Pickering/Connick* framework cases involving allegedly protected expression that neither occurs at nor is about the workplace.

An alternative test was formulated by the Tenth Circuit in *Flanagan v. Munger.* That case dealt with police officers who owned a video store whose inventory included sexually explicit films, and the dispute centered on the police department's actions in prohibiting them from selling or renting the films and in reprimanding them for having done so. The case thus involved " 'speech' which is off the job and unrelated to any internal functioning of the department," or, more specifically, "nonverbal protected expression neither at work nor about work." 890 F.2d at 1562. The Tenth Circuit noted the inherent difficulty in attempting to apply the public-concern test to such a case:

> It is difficult to comprehend how each of the officer's owning of a one-quarter interest in a video store which rents a small portion of sexually explicit videos is making a "comment" on any subject, especially a subject of public concern. Owning a store that rents movies isn't necessarily commentary about the desirability of these films. This is not debate or explicit verbal speech. If plaintiffs had made off-duty statements supporting sexually explicit films, those comments would almost surely relate to a matter of public concern. However, it is not clear that part ownership of a video store which rents a small portion of sexually explicit videos is commentary at all.

*Id.* at 1563 (footnote omitted). It then noted the difficulty in applying a test that was formulated in the context of speech that occurred at the workplace or was about a work-related matter:

> When a statement is made at or about work, use of the public concern test, indeed a narrow definition of public concern, makes sense. The test helps define public concern in an area in which the critical distinction should be whether the speech at issue takes on significance outside the workplace or whether it deals primarily with an employee's personal employment problem. However, in a case like this ... the "speech" already takes place outside of the workplace and

thus the purpose behind using the public concern test is simply irrelevant.

*Id.* at 1564.

The Tenth Circuit then suggested an alternative test for cases falling outside the classic *Pickering/Connick* framework: a court should first determine whether the disputed speech involved "protected expression" and, if so, then proceed to balance— as prescribed by *Pickering* for employee speech that meets the public-concern threshold—the employee's interest in engaging in such expression against the state's interest in promoting the efficient operation of its office. *Id.* at 1564–65. Applying this test, the Tenth Circuit found that the actions taken against the plaintiffs had violated their First Amendment rights. *See also Schalk v. Gallemore,* 906 F.2d 491, 498 n. 6 (10th Cir.1990).

The court considers this modified *Pickering/Connick* framework to be a sensible approach to cases involving expression by public employees when they are not speaking as employees, and agrees with the Tenth Circuit that such an approach is consistent with the principles underlying those cases. Indeed, in *Berger* the Fourth Circuit itself recognized that "the 'public concern' or 'community interest' inquiry is better designed—and more concerned—to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is." 779 F.2d at 998. It would, of course, make no sense to assume that the Supreme Court ever intended to intimate that employees lose their First Amendment protection against adverse employment decisions when they speak other than as employees.

Initially, it is Rothschild's burden to demonstrate that her conduct was constitutionally protected, and that it was a "substantial" or "motivating" factor in the defendants' decision to discipline her. If Rothschild meets that burden, the defendants must show by a preponderance of the evidence that they would have taken the same action even in the absence of the protected conduct. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. at 287, 97

S.Ct. at 576. *See also Rankin v. McPherson*, 483 U.S. at 388, 107 S.Ct. at 2899 ("The State bears a burden of justifying the discharge on legitimate grounds." (citing *Connick v. Myers*, 461 U.S. at 150, 103 S.Ct. at 1691–92)).

■ First, the court finds that Rothschild was not speaking "as an employee" when she participated in the making of the film. It is undisputed that her filmmaking activities took place during nonschool hours, and that neither she nor any of the other participants planned to show the film either to the public or to students at the Academy. Furthermore, while Lafornara may not have realized the precise nature of the project being planned, the fact remains that he gave his permission for use of the Academy's facilities knowing that they would be used for a private commercial venture that was unrelated to schoolwork. Indeed, the record indicates that he was supportive of the project, expecting that a scholarship fund for the Academy would be created if the screenplay were eventually sold. Had Lafornara required more details about the project, he could simply have asked, and it is unrealistic for the Board to suggest that Rothschild was not entitled to rely on Lafornara's authorization, particularly in light of the fact that Lafornara never hinted that anyone else's permission was necessary. The court thus finds that, under the circumstances of this case, Rothschild's off-duty actions, while transpiring on school grounds, occurred in her role as a private citizen. Indeed, in a sense, her filmmaking activities did not occur "at work" for constitutional purposes. In this regard, the court notes that Reville conceded at trial that "[t]he content of the film, if it were done outside the school, would be of little concern to me." Transcript, Item 71 (Volume III), at p. 460. In any event, the court considers Lafornara's permission pivotal on the issue of whether Rothschild and the others were entitled to use the Academy's facilities for a project that both they and Lafornara understood to be unrelated to Rothschild's duties and role as a teacher.

Second, it is clear that Rothschild's speech—more specifically, her artistic expression in the form of acting in the film at issue—was constitutionally protected. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2180–2181, 68 L.Ed.2d 671 (1981); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 499–502, 72 S.Ct. 777, 779–781, 96 L.Ed. 1098 (1952). "One of the fundamental rights secured by the [First] [A]mendment is that of free, uncensored artistic expression—even on matters trivial, vulgar, or profane." *Berger v. Battaglia*, 779 F.2d at 1000 (citing *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); *Edwards v. Habib*, 397 F.2d 687 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969); *Connick v. Myers*, 461 U.S. at 157 n. 1, 103 S.Ct. at 1695 n. 1 (Brennan, J., dissenting)). In support of their claim that Rothschild's appearance in the film was not even expressive speech, the defendants argue that "[t]here was no proof that she ... meant to express anything to anyone by her involvement with the project." Item 75 at 13. But that is precisely the point. Rothschild was not trying to convey any particular message; rather, she was simply acting in a film. And the defendants do not contest that the film, regardless of its quality, represented an earnest artistic endeavor, or that Rothschild and the other participants undertook the project in the sincere belief that it had a chance at marketability. Indeed, immediately prior to making the allegedly defamatory statement that was reported in the local press on July 22, 1980, Kelly characterized the undertaking as follows: "I think the film was a well-intentioned project on the part of the people involved." *See* Trial Exhibit 4; Transcript, Item 70 (Volume II), at pp. 244–45.

Third, while the defendants offer several reasons for their having taken action against Rothschild independent of the content of the film itself, the court rejects these claims. In particular, the court notes that, while Rothschild and the others hoped the prestige of the Academy would be enhanced if the project ultimately resulted in a full-length, commercially successful film,

the record simply does not support the defendants' claim that the participants had represented or had planned to represent that the contents of the film had been authorized by the Academy and the BPSS, or that they would have "passed off" the film as a representative sample of the Academy's work.

In any event, the circumstances leading to the actions taken against Rothschild belie the defendants' arguments. It was established at trial that upon viewing the so-called body-shop scene on July 11, Reville became extremely angry, struck his hand against a table, and ordered that the videotape be stopped. He then told Morris and Rothschild that they were in great trouble and left the room. In a second meeting later that day, Reville reviewed the film again and discussed the situation with Kelly and other Board members. According to Kelly, they discussed their feelings about the film, and he and the others "felt that we should make a decision around *the merits of this product.*" (Emphasis added.) Both Rothschild and Morris were disciplined immediately after that meeting, with Rothschild being told that she should consider herself fired. Viewing this evidence in light of the entire record, it is apparent to the court that the content of the film was not merely a substantial or motivating factor behind the action initially taken against Rothschild, but was the primary motivating factor for that action. Furthermore, Rothschild was never rehired, and the defendants have never suggested that there was any reason for the Board's decision not to rehire her other than her participation in the film. Based on the entire record, the court concludes that the content of the film remained at least a substantial or motivating factor in the Board's ultimate decision not to rehire Rothschild. In addition, the defendants have not convinced the court that they would have taken the same actions had they found the contents of the videotape less offensive.

Finally, the defendants have not demonstrated that Rothschild, by participating in the production, impaired the efficiency of the public services provided by the Academy in particular or the Board of Education in general. The film was not intended to portray or to comment upon the Academy or the BPSS, and it was not to be viewed by the public or by anyone at the Academy. Furthermore, no evidence was introduced indicating that the functioning of the school was disrupted in any way while the film was being made. As stated by the Supreme Court: "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). The defendants have thus failed to establish that Rothschild's conduct damaged "the effective functioning of the public employer's enterprise," *Rankin v. McPherson*, 483 U.S. at 388, 107 S.Ct. at 2899, or "somehow undermine[d] the mission of the public employer." 483 U.S. at 390, 107 S.Ct. at 2900.

Under these circumstances, the court finds that the defendants violated Rothschild's First Amendment rights by their roles in her suspension or dismissal and the refusal to rehire her based on the content of her protected First Amendment expression. *See Rankin v. McPherson*, 483 U.S. at 390, 107 S.Ct. at 2900.

### B) *Qualified Immunity*

The Supreme Court has held that government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order to pierce the shield of qualified immunity, Rothschild must demonstrate that the legal norms allegedly violated by Reville and Kelly "were clearly established at the time of the challenged actions," *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985), focusing on the "objective legal reasonableness" their actions. *Harlow v. Fitzgerald*, 457 U.S. at 819, 102 S.Ct. at 2739. "The contours of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). *See also Giacalone v. Abrams,* 850 F.2d 79, 85 (2d Cir.1988).

■ In light of these standards, this issue does not merit extended discussion. First, the court notes that *Connick,* the Supreme Court's most significant refinement of *Pickering,* was decided approximately three years after the events underlying Rothschild's First Amendment claim. Second, as the discussion above indicates, the present case does not even fit comfortably into the balancing test set forth in *Pickering.* Under these circumstances, Reville and Kelly clearly are entitled to qualified immunity for their roles in the actions taken against Rothschild insofar as their potential personal liability is concerned. Although the court has found that the actions of Reville and Kelly violated Rothschild's First Amendment rights, it is plain that, in light of pre-existing law, the unlawfulness of their actions was not "apparent" at that time. Consequently, they cannot be held personally liable.

### C) *The Board's Liability*

■ The Buffalo Board of Education is a municipal corporation under the laws of the State of New York, N.Y. EDUC. LAW § 2551 (McKinney 1981), and, as such, it is subject to liability under 42 U.S.C. § 1983. *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also* N.Y. EDUC. LAW § 2554 (McKinney 1981 & Supp. 1991).

■ Specifically, the Supreme Court has held that a municipality can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dep't of Social Services,* 436 U.S. at 694, 98 S.Ct. at 2038.

Municipal liability cannot be based on a *respondeat superior* theory, 436 U.S. at 691, 98 S.Ct. at 2036; rather, it flows from "acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Insofar as Rothschild has sued Reville and Kelly in their official capacities as the Superintendent of Schools and the President of the Board, respectively, her claims will be treated as claims against the Board itself. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985). The Board cannot, however, avail itself of the qualified immunity to which those individuals are entitled. 473 U.S. at 166–67, 105 S.Ct. at 3105–06; *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Moreover, the Supreme Court has held that, under appropriate circumstances, liability may be imposed upon a municipality for a single decision by municipal policymakers:

> If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*Pembaur v. City of Cincinnati,* 475 U.S. at 481, 106 S.Ct. at 1299 (footnote omitted).

■ First, the court finds that the Board is liable for Reville's decision to discipline Rothschild in July, 1980. In addition to there being no dispute that it was Reville who was responsible for that decision, it is clear that he was authorized to make it. New York Education Law provides:

> The superintendent of schools of a city shall possess, subject to the by-laws of the board of education, the following powers and be charged with the following duties:

**658**

1. To be the chief executive officer of such board and the educational system, and to have a seat on the board of education and the right to speak on all matters before the board, but not to vote.

2. To enforce all provisions of law and all rules and regulations relating to the management of the schools and other educational, social and recreational activities under the direction of the board of education.

N.Y. EDUC. LAW § 2566(1), (2) (McKinney 1981). Section 2566 also explicitly provides that the Superintendent of Schools is

[t]o have supervision and direction of ... teachers ... [and] to report to [the] board of education violations of regulations and cases of insubordination, and to suspend [a] ... teacher ... until the next regular meeting of the board, when all facts relating to the case shall be submitted to the board for its consideration and action.

N.Y. EDUC. LAW § 2566(6) (McKinney 1981). In light of the powers, duties, and overall role of the Superintendent of Schools as expressly provided under New York law, the court finds that the action taken against Rothschild in July, 1980, at Reville's direction represented official Board policy. This conclusion is further compelled by the fact that Reville was acting on the advice of Kelly, the other Board members present at the meeting held on the afternoon of July 11, and the Corporation Counsel.

Second, although it is not clear whether a formal vote was taken on the matter, the Board did not rehire Rothschild in the fall, and it is undisputed that it did not do so because of Rothschild's participation in the making of the film. It is thus clear that, whether formally or *de facto*, Kelly and the other members of the Board ratified Reville's decision, and that endorsement plainly represented official Board policy.

The court does not consider significant whether Rothschild was technically only "suspended" at the time she was initially called by Assistant Superintendent Raiken in July, 1980. It is apparent from the record that Reville's intent from the start was that Rothschild would never work again in the BPSS, and the Board clearly endorsed that judgment.

In short, the court finds that the actions taken against Rothschild represented official Board policy. Consequently, the Board is liable for the violation of Rothschild's First Amendment rights.

D) *The State–Law Claims*

1. Defamation

In the second cause of action, the plaintiffs allege that they were defamed by comments made by Reville and Kelly in the presence of news reporters that were subsequently printed or otherwise published in the media.

With regard to the statement attributed to Reville in two newspaper articles on July 22, 1980, and August 26, 1980, Reville testified that he never made the statement, and the court finds that the plaintiffs have failed to prove by a preponderance of the evidence that he did.

The balance of the plaintiffs' claim relates to statements that were also published on July 22, 1980. As noted above, Kelly was reported in a local newspaper to have said: "[Q]uestions arise over whether it is the type of film which children should be exposed to"; and Reville was quoted by a local television reporter as having said: "We think it is an offensive film. We belief [sic] that school equipment and school facilities were used to put together a film which is not of the type that we believe should be produced for a school, in a school or about a school."

 Kelly's statement is clearly an expression of opinion. With regard to Reville's statement, the court has already found in its summary-judgment decision that the plaintiffs cannot establish defamation based on a charge that the film was "offensive." *See* Item 46 at pp. 9–10. Furthermore, since, in fact, school facilities *were* used in making the film and the film *was* produced in and about a school, the remaining portion of Reville's statement that is potentially actionable—that the plaintiffs had helped make "a film which is

not of the type that we believe should be produced for a school"—is also clearly an expression of opinion. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974); *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 223–26 (2d Cir.1985); *Hotchner v. Castillo–Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Silsdorf v. Levine,* 59 N.Y.2d 8, 462 N.Y.S.2d 822, 825, 449 N.E.2d 716, 719 (Ct.App.), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983). Consequently, the statements still at issue are actionable only if they "implie[d] the allegation of undisclosed defamatory facts as the basis for the opinion[s]." *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d at 226 (citations and footnote omitted). Liability may thus attach if these opinions were "coupled with a clear but false implication" of unstated facts, *Hotchner v. Castillo–Puche,* 551 F.2d at 913, and the plaintiffs can establish that Reville and Kelly "had knowledge of the falsity or probable falsity of the underlying facts." *Id.* (citation omitted).

■ The plaintiffs complain that Kelly's statement falsely "implies that children were to be exposed to an improper film." Item 74 at 6. However, as even the Supreme Court recently has used the word "children" to describe high-school students and has referred to a high-school senior as a "boy," *see Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682–84, 106 S.Ct. 3159, 3163–65, 92 L.Ed.2d 549 (1986), the plaintiffs have not established that Kelly's statement was false since at least two high-school students were, in fact, "exposed" to the film—specifically, the two who were involved in making it. *See Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 (2d Cir.1986), *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987). Furthermore, the court has not been convinced that other students who remained at the school for extracurricular activities during the time the film was being made could not have inadvertently seen at least a portion of the filming. Finally, Kelly testified that at the time he made the statement he believed "there was a good chance" other

students at the school would be exposed to the film and did not realize that the project was designed to produce a pilot for Columbia pictures. *See* Transcript, Item 70 (Volume II), at pp. 245–46. Finding Kelly's testimony credible, the court concludes that he did not know of "the falsity or probable falsity" of any facts on which he based his opinion. Consequently, the court finds that the plaintiffs have failed to establish that they were defamed by Kelly's statement.

■ With regard to Reville's statement that the plaintiffs were involved with "a film which is not of the type that we believe should be produced for a school," the court likewise finds that the plaintiffs have failed to establish that the statement was false. Although the project was a private commercial venture, the plaintiffs testified that they hoped the film, if successful, would enhance the prestige of the Academy, lead to job opportunities for graduating students, and provide a source for the establishment of a scholarship fund for Academy students. Viewed from that perspective, Reville could understandably have felt that the film was produced, at least in part, "for" the school. The court thus finds that the plaintiffs have failed to prove that they were defamed by Reville's statement.

### 2. Prima Facie Tort

The plaintiffs claim that Reville and Kelly were responsible for turning the film over to the District Attorney's Office for an investigation of whether the film was pornographic knowing that there was no justification for doing so. The plaintiffs contend that their actions in this regard constituted the *prima facie* tort of intentionally inflicting economic damage. In support of their claim, the plaintiffs argue that Reville and Kelly used legal procedures merely to harass and to oppress them.

■ The New York Court of Appeals has identified the requisite elements of a *prima facie* tort as: "(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or

justification, (4) by an act or series of acts which would otherwise be lawful." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (Ct.App.1985) (citations omitted). The Court of Appeals has further held that "there is no recovery in prima facie tort unless malevolence is the sole motive for [a] defendant's otherwise lawful act or ... unless [the] defendant acts from 'disinterested malevolence.'" *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459, 468 (Ct.App.1983) (quoting *American Bank & Trust Co. v. Federal Reserve Bank of Atlanta*, 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983 (1921) (Holmes, J.)).

■ In light of these standards, it is clear that the plaintiffs have not proven their case. The record indicates that Reville and, to the extent he even participated, Kelly were acting on the advice of the Corporation Counsel, and that the Corporation Counsel felt that he and representatives of the Board simply were not qualified to make a determination as to whether the film was pornographic. Acting on this advice, Reville allowed the Corporation Counsel to take custody of the videotape and to submit it to the District Attorney's Office for its own, independent review. In light of the entire record, the plaintiffs have clearly failed to prove that Reville and Kelly were motivated solely by malice or disinterested malevolence. Moreover, the plaintiffs have not even established that Reville and Kelly intentionally inflicted any harm, or that they acted without excuse or justification. This conclusion would not change even if, as the plaintiffs allege, the defendants were concerned that failure to turn the tape over to the District Attorney's Office might later be construed as an attempted "cover-up."

### 3. Libel by Publishing a False Criminal Complaint

■ The plaintiffs also claim that, by having the videotape delivered to the District Attorney's Office, Reville and Kelly falsely communicated to the public-at-large that the plaintiffs had made a pornographic film, and that in doing so they libeled the plaintiffs. In support of their claim, the plaintiffs rely on *Williams v. Williams*, 23 N.Y.2d 592, 298 N.Y.S.2d 473, 246 N.E.2d 333 (Ct.App.1969). In that case, the New York Court of Appeals held that a party can be held accountable for libel for "maliciously institut[ing] a judicial proceeding alleging false and defamatory charges, and ... then circulat[ing] a press release or other communication based thereon." 298 N.Y.S.2d at 479, 246 N.E.2d at 337. It is apparent that the plaintiffs cannot meet this standard.

First, the plaintiffs have offered virtually no evidence that could sustain a claim that the defendants acted maliciously by referring the matter to the District Attorney's Office. Moreover, while the plaintiffs argue that there was no good-faith basis for a charge of pornography, the record does not even establish that a "charge" was made or a judicial proceeding instituted. Rather, Reville, acting on the advice of counsel, agreed that the determination as to whether the film would even support such a charge should be made in the first instance by the District Attorney.

Second, the plaintiffs have failed to offer any evidence indicating that either Reville or Kelly told anyone that they knew or even believed that the film was pornographic. To the extent that the plaintiffs are suggesting that the defendants libeled them simply by turning the videotape over to the District Attorney's Office, they have not offered any evidence indicating that the defendants attempted to initiate publication of the fact that the matter had been referred or that they expected someone else would do so. Indeed, the record supports the conclusion that, if anything, the defendants hoped the matter would attract as little public attention as possible.

### 4. Intentional Infliction of Emotional Distress

■ The plaintiffs' final cause of action also does not require extended discussion. To prove a claim for the intentional infliction of emotional distress under New

York law, the plaintiffs must establish that Reville and Kelly engaged in "extreme and outrageous conduct" by which they "intentionally or recklessly cause[d] severe emotional distress." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (Ct. App.1983) (adopting the definition set forth in RESTATEMENT (SECOND) OF TORTS § 46(1) (1977)). Liability will be found " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* (quoting comment d to RESTATEMENT (SECOND) OF TORTS § 46(1) (1977)). It is apparent that the defendants' actions in turning the videotape over to the District Attorney's Office simply do not meet this rigid standard.

In sum, the court finds for plaintiff Christie Rothschild on the first cause of action alleging a violation of her First Amendment right to freedom of expression. With regard to defendants Eugene Reville and David Kelly, the court finds that they are entitled to qualified immunity for their roles in the actions taken against Rothschild; consequently, they are liable on this cause of action only in their official capacities at the time of Superintendent of Schools and President of the Board of Education, respectively. With regard to the state-law claims, the court finds for the defendants.

The remaining parties are directed to meet in order to discuss the possibility of settling the amount of damages on the first cause of action. The court shall meet with counsel on January 14, 1992, at 9:00 a.m. to discuss the progress of these negotiations and, if necessary, to set a further schedule.

So ordered.