Captain Steven W. JOHNSON, Plaintiff,

v.

COUNTY OF LOS ANGELES FIRE DEPARTMENT; Fire Chief P. Michael Freeman; Chief William J. Zeason, and Deputy Fire Chief Robert P. Blackburn, Defendants.

No. CV 93–7589–SVW(JGx).

United States District Court, C.D. California.

Oct. 25, 1994.

---

ACLU Foundation of So. Calif., Paul Hoffman, Los Angeles, CA, Barsy, Joseph & Lichtenstein, Burton Joseph, Chicago, IL, Jenner & Block, Ann M. Kappler, Jodie L. Kelley, Washington, DC, for plaintiff.

DeWitt W. Clinton, County Counsel, Lester J. Tolnai, Stephen R. Morris, Principal Deputy County Counsel, Los Angeles, CA, for defendants.

## SECOND AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILSON, District Judge.

The Court filed a Findings of Fact and Conclusions of Law in this case on June 9, 1994. The Court amended the Findings of Fact and Conclusions of Law on October 18, 1994. The Court hereby amends the Amended Findings of Fact and Conclusions of Law as follows: page 3, line 18: substitute McCann for Malamuth; page 19, lines 18, 19 and page 20, lines 3, 11, and 16: substitute

Malamuth for McCann. The proper order appears in full below.

## I. *INTRODUCTION*

In July 1992, the County of Los Angeles Fire Department promulgated a written policy to battle sexual harassment in the department ("the policy"). The policy prohibits sexually harassing conduct, as well as certain materials such as *Playboy* magazine. Section III.C. of the policy states in pertinent part:

> The following types of sexual material are prohibited in all work locations, including dormitories, rest rooms and lockers: ... Sexually-oriented magazines, particularly those containing nude pictures, such as *Playboy, Penthouse* and *Playgirl.*

Captain Johnson ("plaintiff") has filed the present action under 42 U.S.C. § 1983, alleging that Section III.C. of the policy violates his right to free speech under the First and Fourteenth Amendments of the Constitution of the United States. He seeks a declaratory judgment that the policy, as applied to the private possession, reading and consensual sharing of *Playboy* in the fire station is unconstitutional. He also seeks a permanent injunction preventing the defendants from enforcing the policy against his private possession, reading and consensual sharing of *Playboy.*

After hearing the evidence presented by the parties, the Court finds that plaintiff's private possession, reading and consensual sharing of *Playboy* is protected by the First Amendment. Accordingly, the sexual harassment policy is invalid as applied to these activities.

## II. *Facts*

Although the floor plans of the various fire stations in Los Angeles County vary from station to station, all stations have personal areas, including lounges, rest rooms and dormitories. Most of the stations have sleeping quarters consisting of dormitories divided into individual sleeping areas by barriers which are at least four to six feet high. In several of the stations the sleeping quarters consist of individual rooms, each containing a single bunk. The fire fighters are assigned lockers to store personal items.

Although the fire stations do mandate living in close quarters, they offer sufficient privacy for a fire fighter to read a magazine, either in his private bunk area or in the relaxation area, without exposing the contents to an unwitting onlooker.

Plaintiff is a 27 year veteran of the fire department and is based in Station 114. Station 114, like the other stations, has a common lounge. The dormitories in Station 114 consist of small private rooms for each fire fighter.

Fire fighters generally work an average of ten 24–hour shifts each month. Sometimes the fire fighters work three consecutive shifts, which means that their presence is required at the station for 72 hours straight.

During a typical 24–hour shift, the fire fighters are assigned duties from 8:00 a.m. to 5:00 p.m. During the evening hours, the fire fighters must be available to respond to emergencies. Absent such emergencies, however, the fire fighters are free to read, study, exercise, watch television and relax in any other manner they choose. As Retired Assistant Fire Chief Neil McCann testified, relaxation is important for the mental health of the fire fighters.

Most fire fighters in the Los Angeles County Fire Department are male. The first female fire fighter was hired in 1983. Currently, only 11 women are employed as fire fighters. Prior to 1992, magazines with pictures of nude women were commonplace in the fire stations. Such magazines, including *Playboy, Penthouse, Hustler, Cheri,* and *Gallery,* could often be found in bathrooms as well as recreation and reading areas. Sometimes male fire fighters would make lewd comments or gestures when reading these magazines.

Prior to 1992, plaintiff often brought a personal copy of *Playboy* to the fire station. He would quietly read *Playboy* in his room and in common areas. He would share the magazine with others who expressed interest in reading it.

In 1992, the Fire Department enacted the sexual harassment policy for the purpose of

combatting sexual harassment. Patricia Vaughan, a Senior Departmental Employee Relations Representative, drafted the policy under the supervision of Chief Deputy Fire Chief Larry Miller. She testified that one of her primary reasons for including Section III.C.'s ban of "sexually oriented" magazines was her fear that individuals reading such magazines would develop negative feelings towards their female coworkers. She also testified that, on several occasions, she encountered sexually oriented magazines at the fire station and was personally offended to know that the fire fighters could read such material while at work.

Several female employees of the fire department testified that they find the presence of magazines with nude pictures to be offensive and degrading. Cynthia Barbee, a ten-year veteran fire fighter who currently holds the rank of Fire Fighter Specialist, often encountered sexually oriented magazines, sometimes with nude pictures on the cover, prior to 1992. Barbee testified that she was offended by the fact that the male fire fighters often made lewd comments and gestures while reading the magazines. Similarly, Fire Fighter Janet Babcock testified that she was offended by such magazines as well as the constant barrage of abusive and suggestive remarks made by male fire fighters while reading magazines with nude pictures.

On the other hand, at least two female fire fighters are not offended by the presence of *Playboy* at the fire stations. Both Fire Captain Deborah Lawrence and Firefighter Specialist Jerilynn Haertsch testified that *Playboy* does not make them feel intimidated or uncomfortable.

Lisa Natale, the Corporate Director of Market Research at Playboy Enterprises, Inc., testified that, on average, only 15% of *Playboy* magazine consists of nude photographs. The remainder of the magazine consists of interviews, short stories and articles on such topics as politics, sports and recreation. *Playboy* has featured articles by many prominent authors, as well as interviews with noted politicians, businessmen, scientists and artists. Insofar as *Playboy* has taken a position on gender roles in society, *Playboy* is a staunch advocate of equality for women. *Playboy*'s own President and CEO, Christie Hefner, is a woman. Over half of its employees are women. According to market studies, almost two million women read *Playboy* every month. Among the subscribers to *Playboy* are many important civic and academic libraries.

## III. *Discussion*

### A. *Regulation of the Speech of Government Employees*

■ It is firmly established that individuals do not abandon their First Amendment rights by accepting employment with government agencies. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). At the same time, courts have recognized that government bodies, like private employers, need to operate in an efficient manner. *Id.*

With these two competing interests in mind, the Supreme Court has established a balancing test for determining whether restrictions on the speech of government employees are constitutional. *See Connick v. Myers*, 461 U.S. 138, 148–50, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

■ Under the *Pickering/Connick/Rankin* balancing test, the Court must first determine whether the restricted speech relates to a matter of public concern. If the speech relates to a matter of purely private concern, the Court should abstain from interfering with the employment relationship. *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687. If, on the other hand, the speech relates to a matter of public concern, the Court must weigh the interest of the individual in exercising his right to free expression against the interest of the government body in maintaining efficient operations. *Id.*

### B. *Public/Private Concern*

■ The first issue is whether *Playboy* magazine is a matter of public concern. In order to make this determination, the Court must look to the "content, form and context"

of the magazine. *Rankin,* 483 U.S. at 385, 107 S.Ct. at 2897 (employee's statement to coworker that she hoped the next attempt on the president's life would be successful is of public concern).

The Ninth Circuit has given a broad interpretation to the requirement that a matter be of public concern: "Speech that can fairly be considered as relating to *any matter* of political, social, or other concern to the community is constitutionally protected." *Gillette v. Delmore,* 886 F.2d 1194, 1197 (9th Cir.1989) (emphasis added) (fire fighter's criticism of other fire fighters is of public concern); *see also Hyland v. Wonder,* 972 F.2d 1129 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993) (memorandum criticizing agency of inefficiency and abuse is of public concern); *c.f. Kotwica v. Tucson,* 801 F.2d 1182 (9th Cir. 1986) (statement to press by agency employee in which she professed to speak in her official capacity is not of public concern).

Other circuits have defined "public concern" broadly as well. For example, the D.C. Circuit stated:

> We read the public concern criterion as referring not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employees bureaucratic niche.

*National Treasury Employees Union v. United States,* 990 F.2d 1271 (D.C.Cir.1993) (speech on technology of Civil War is of public concern); *see also Berger v. Battaglia,* 779 F.2d 992 (4th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986) (police officer's performances in black-face are of public concern).

■ Plaintiff has offered testimony that *Playboy* contains articles relating to politics, sports, arts and entertainment. *Playboy* also contains stories by prominent authors and interviews with public figures. The Court's perusal of the exhibits confirms this testimony. In other words, the magazine amply satisfies the Ninth Circuit standard that it relate to "any matter" of concern to the community. There has been no showing—or even argument—that the magazine relates merely to plaintiff's bureaucratic niche.

Accordingly, the Court is compelled to find that plaintiff's reading of *Playboy* amounts to expression relating to matters of public concern.

## C. *Balancing*

■ In balancing plaintiff's First Amendment rights against the defendant's interest in maintaining an efficient fire department, the Court must keep in mind that defendants bear the burden of justifying the policy's prohibitions on legitimate grounds. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

■ The Court must consider the manner, time and place of the employee's expression. *Id.* Pertinent considerations include whether the statement impairs discipline by superiors or harmony by coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *Id.* at 388, 107 S.Ct. at 2899.

Furthermore, the Courts have generally found that content-based regulations pose a greater burden on the individual's rights than regulations which are content neutral. *See Rankin,* 483 U.S. at 390, 107 S.Ct. at 2900 (considering content-based nature of decision to terminate); *c.f. INS v. Federal Labor Relations Auth.,* 855 F.2d 1454 (9th Cir. 1988) (stating that because INS policy prohibiting immigration officers' from adorning uniform with union pins is content neutral, it is constitutional); *National Treasury Employees Union,* 990 F.2d at 1273 (finding plaintiffs' interest to be somewhat less weighty because regulation was content neutral).

### 1. *Content–Based Regulation*

■ The prohibition of Section III.C. is undoubtedly content-based. It only bans magazines which are "sexually oriented, especially those including nude pictures." It does not apply to other types of magazines, such as magazines which are oriented towards sports, politics, fashion or gossip. Nor

does it apply to other types of reading material.

■ Content-based regulations pose a particularly onerous restriction on First Amendment rights because they threaten to alter the free marketplace of ideas. *See American Booksellers Ass'n v. Hudnut,* 771 F.2d 323, 327 (7th Cir.1985), *aff'd,* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (quoting *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)) (" 'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . .' ").

Defendants offer two arguments to support the proposition that the prohibition is not, in fact, content-based. First, defendants argue that the policy only prohibits nude pictures, and nudity is not speech. *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). This argument is spurious. Section III.C. does not by its terms apply to nude pictures, it applies to magazines which are "sexually oriented." Pictures of nude women which are not contained in sexually oriented magazines would not be covered by Section III.C.; similarly, sexually oriented magazines which contain no nudity are banned by Section III.C.

The second argument proffered by defendants is that Section III.C. does not regulate the content of the magazines but rather the "secondary effects." *Renton v. Playtime Theaters,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (finding that regulation of adult theaters which was designed to prevent the decay of neighborhoods was content-neutral). This argument is equally unavailing. It is undisputed that Section III.C. of the policy is concerned with the communicative or emotive impact of the "sexually oriented" magazines.[1] Such communicative or emotive impact may be sexual arousal on the part of the male reader or offense on the part of an unwitting female viewer. The Supreme Court has consistently held that a govern-

ment body cannot rely on the doctrine of "secondary effects" when the regulation is concerned with the emotive impact of the speech. *See Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (regulation prohibiting placement of signs near foreign embassies which would offend the foreign governments is content-based); *Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (regulation permitting distribution of newspapers but not commercial handbills is content-based); *Forsyth County v. Nationalist Movement,* —— U.S. ——, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (city ordinances which charge fees for demonstrations based upon potential hostile response of public is content-based).

In short, Section III.C. of the policy is undoubtedly a content-based regulation. As such, the interference with plaintiff's First Amendment rights is particularly weighty.

### 2. *Plaintiff's Interest in Free Speech*

Section III.C. poses a particularly onerous limitation of plaintiff's First Amendment rights both in terms of the manner, time, and place of plaintiff's proposed speech and in terms of the scope of the prohibition.

To begin with, the Court finds the prohibition to be particularly onerous because it restricts the reading of *Playboy* at all times, including times when the behavior of the fire fighters is otherwise unrestricted. Several Circuits have held that an employee's right to freedom of expression is entitled to a great degree of weight when the speech occurs during the employee's free hours. *See Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989) (police officers disciplined for owning video store with pornographic videos); *Berger,* 779 F.2d 992 (police officer disciplined for black-face performance).

■ The prohibition in the present case has an effect much like the restrictions in *Flanagan* and *Berger.* During the evening, the fire fighters are available to respond to emergencies. Absent such emergencies,

---

1. As Patricia Vaughan, the County employee responsible for drafting the policy, testified, one of the main reasons for including the ban of *Play-* *boy* was her belief that the magazine had a negative impact on the readers' perception of female coworkers.

however, fire fighters have a great deal of free time.[2] They may watch television, study, exercise or read any number of magazines and novels of their choosing. *Playboy* is singled out as one of several publications they may not read. Unlike a regulation which restricts the fire fighters' expression during hours in which their freedom is already restricted by the necessities of professional duties, Section III.C. serves to limit their expression during hours when their behavior is otherwise unrestricted.

Furthermore, Section III.C. is onerous because it leaves open no opportunity for plaintiff's reading of *Playboy* at any point while plaintiff is on duty. While this fact might be inconsequential if plaintiff worked eight-hour shifts, plaintiff serves 24-hour shifts. He often works three shifts in a row. During this entire period plaintiff's presence is required at the fire station, and the fire station serves as plaintiff's residence as well as his workplace. Accordingly, the only way he can exercise his freedom of expression is through insubordination or by terminating his employment.

■ Defendants argue that, because plaintiff is seeking to merely read rather than communicate ideas, his First Amendment rights are entitled to a lesser degree of weight. The Court must reject this argument as contrary to the fundamental principle of First Amendment law that freedom of expression includes the right to receive as well as the right to communicate ideas. *See Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

■ In short, because the policy bans the reading of *Playboy* at times when fire fighters' behavior is otherwise unrestricted, because the policy permits no window for plaintiff's exercise of his freedom of expression, and because the fire station operates as plaintiff's *de facto* home for consecutive days, the Court finds that the policy poses a particularly severe restriction on plaintiff's First Amendment rights.[3]

### 3. *Defendants' Interest in Prohibiting Playboy*

In quantifying the defendants' interest in prohibiting *Playboy*, the Court may consider defendants' interest in maintaining an efficient fire department. *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687. Pursuant to this standard, defendants argue that the prohibition furthers the County's interest in maintaining an efficient fire department insofar as it serves to prevent sexual harassment of female employees. *See, e.g., Harris v. Forklift Systems,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (workplace may be sexually harassing if permeated with discriminatory intimidation and insult sufficiently severe to alter conditions of work environment).

**2.** Defendants argue that plaintiff is being paid for the time that he spends at the firehouse in the evening. The mere fact, however, that an employee is compensated by the County does not provide the County with justification to shape employee's speech. *See Rankin,* 483 U.S. at 378, 107 S.Ct. at 2891. The issue is whether reading *Playboy* interferes with plaintiff's duties as employee. The issue is not whether the fire fighter is compensated for his free evening hours.

Defendants also argue that the public would be shocked if it knew that plaintiff were reading *Playboy* during hours of employment. This too is an impermissible consideration—the fact that the public would be offended by the speech of a public employee is not a sufficient basis for disciplining the employee, as long as the speech does not interfere with the employee's duties. *Flanagan,* 890 F.2d at 1128.

**3.** Plaintiff's First Amendment right is not diminished by the fact that the prohibition is of "sexually oriented" material. As stated by the Ninth

Circuit "free expression intended for entertainment purposes is generally entitled to the full panoply of first amendment protections." *Tovar v. Billmeyer,* 721 F.2d 1260 (9th Cir.1983), *cert. denied,* 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 152 (1984) (regulation of adult bookstore subject to strict scrutiny). *See also Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989) (regulation of indecent material subject to strict scrutiny). Although several cases have treated "sexually oriented" speech differently from other forms of protected speech, they have only done so in the context of protecting children or a captive audience, *see e.g., FCC v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), or in the context of regulating the "secondary effects" of the speech. *See, e.g., Mitchell v. Comm'n on Adult Entertainment Establishments of the State of Delaware,* 10 F.3d 123 (3rd Cir.1993).

■ There is no doubt that the prevention of sexual harassment is a compelling government interest. Sexual harassment may interfere with discipline by superiors or harmony among coworkers; it may have a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; and it may interfere with the regular operation of the fire department. Furthermore, the County need not permit sexually offensive speech to rise to actual sexual harassment before it may take action.

■ However, simply alleging the need to avoid sexual harassment is not enough. Under the *Connick/Rankin/Pickering* test, defendants bear the burden of showing that real, not imagined, disruption is threatened. *McKinley v. Eloy*, 705 F.2d 1110, 1115 (9th Cir.1983). Furthermore, the defendants must show that the threat of disruption is "actual, material and substantial." *Roth v. Veterans Admin.*, 856 F.2d 1401, 1407 (9th Cir.1988).

■ In the present context, defendants may meet this burden by showing that the quiet reading and possession of *Playboy* threatens actual disruption of the fire station. In other words, defendants may meet its burden under *Rankin*, by showing that *Playboy* directly contributes to a sexually harassing environment.

Defendants' evidence may be divided into two categories. First, defendants have produced evidence that female fire fighters are offended by the presence of *Playboy* in the fire stations. Second, defendants have presented evidence that male fire fighters exposed to *Playboy* will develop negative thoughts towards their female coworkers.

*a. Female Fire Fighters' Offense at the Presence of Playboy in Fire Stations*

Defendants argue that *Playboy* contributes to a sexually harassing environment because a reasonable woman would be offended by the presence of *Playboy* at the workplace. After carefully reviewing the evidence presented at trial, the Court finds that such a finding is simply not supported.

■ Defendants presented two witnesses, Patricia Vaughan and Janet Babcock, who testified that they were offended by the existence of *Playboy* at the work place. Vaughan and Babcock also testified that they were also offended by seeing pictures of nude women inside and on the cover of certain magazines and that they were offended by the lewd comments and displays made by men when reading magazines with nude women.

Similarly, a third witness, Cynthia Barbee, testified that she feels and has always felt "uncomfortable with such magazines in the workplace," and that she has also heard "lewd remarks by male fire fighters while they were looking at sexually explicit magazines." She also testified that the presence of such magazines makes her feel unwelcome in the workplace and interferes with her ability to work.

■ The testimony of Vaughan, Babcock and Barbee cannot establish that *Playboy* is offensive for a number of reasons. It is apparent in the declaration of Barbee and in the cross examination testimony of Vaughan and Babcock that their concern was not the magazine itself but rather the belief that men were entertaining degrading thoughts while reading it.[4] The problem with this testimony is that Title VII protects women from hostile and abusive conduct, such as comments and actions. *See Harris*, —— U.S. at ——, 114 S.Ct. at 370. Defendants have cited no case which stands for the proposition that Title VII protects women from thoughts alone. Although Title VII would certainly prevent a

---

**4.** It is unclear whether Barbee is testifying that she is offended by the very sight of *Playboy* or whether she is offended by lewd comments often made in connection with the reading of *Playboy* as well as her belief that it influences the way her male coworkers think about her. The Court finds that her testimony is, essentially, the latter—that she is offended because she believes it affects her male coworkers' views.

At one point she does state that she is offended by magazines which have "graphic sexually explicit nude photographs on the cover." That testimony could not, however, have been referring to *Playboy*, which displays no nudity on the cover.

male employee from manifesting sexually degrading thoughts in the form of sexually degrading comments or actions, until the thought is manifest, it is outside the scope of Title VII.

■ Second, the witnesses' testimony also focussed on the fact that they are offended by the lewd comments made by some male fire fighters when reading *Playboy*. This testimony is irrelevant. Plaintiff does not seek to make lewd comments; he does not seek to make lewd gestures. The County certainly has the power to regulate such activity and, in fact, has done so through Section III.B. of the sexual harassment policy.[5] Plaintiff does not challenge the constitutionality of this provision.

■ Third, much of the witnesses' testimony related to the fact that they are offended at the sight of nude pictures of women. This testimony is irrelevant to the present action as well. Plaintiff is merely seeking to read and possess *Playboy* quietly and in private. He is not seeking to expose the contents of the magazine to unwitting viewers. The County has prohibited the display of nude pictures in Section III.B. of the sexual harassment policy.

■ The Court, as stated above, has reached the factual finding that, although the fire stations mandate living in close quarters, they do permit enough privacy such that plaintiff could read *Playboy* without exposing the contents to unwitting viewers.[6] The unwitting viewer would therefore see nothing other than the cover of *Playboy*, which does not contain nudity. Notably, not one witness testified that she found the mere sight of the cover to be offensive.

In short, the testimony of Vaughan, Babcock and Barbee is that they are offended, first, by the knowledge that men who read *Playboy* might entertain degrading thoughts about their coworkers and, second, that they are offended by offensive comments often made by individuals reading *Playboy*. This testimony cannot serve to establish that the quiet reading of *Playboy* contributes to a sexually harassing atmosphere under Title VII—mere thoughts are outside the scope of Title VII; and the quiet reading of *Playboy* is a far cry from lewd comments and gestures. Presently before the Court is plaintiff's desire quietly to read and possess *Playboy*. If plaintiff engages in such behavior in the fire station, a female fire fighter will, at most, be exposed to the cover of the magazine. The issue is therefore whether mere exposure to the cover of *Playboy* directly contributes to a sexually harassing atmosphere. Defendants have presented no credible testimony that it does.[7]

---

5. Section III.B. of the policy prohibits: "Vulgar, obscene, or demeaning comments, jokes or stories; Sexual remarks about a persons body, clothing or relationships; Jeers, whistles, leering or other actions which convey a sexual meaning; Profanities of a sexual nature which have the effect of embarrassing another employee; and Displaying sexually oriented material."

6. Prior to trial, defendants claimed that they would show that female fire fighters were a "captive audience." One of defendants' witnesses, Barbee, testified that, because of the close-working nature of the fire department, it is impossible for a fire fighter to read *Playboy* without exposing the contents to others.

Based on the testimony of other witnesses, including that of plaintiff, the Court has made a factual finding to the contrary. A fire fighter choosing to read *Playboy* may do so without exposing the contents to unwitting viewers. Fire fighters who wish not to see the contents, may avoid doing so by averting their eyes. Individuals who may avoid material by averting their eyes, are not a "captive audience."

7. A different case would be before the Court if the defendants had presented persuasive evidence establishing that the mere sight of a *Playboy* magazine poses a direct offense to women. If defendants had presented evidence that the sight of the *Playboy* logo causes a shock to women as, for example, the sight of a swastika may cause to a Jewish person or a racial epithet may pose to an African American, defendants would have taken the first step in showing that the quiet reading of *Playboy* contributes to a sexually harassing atmosphere.

Of course, had defendants made such a showing, the Court would have had to weigh the competing evidence presented by plaintiff. Plaintiff has presented evidence that several million women read *Playboy* every month, that over 50% of *Playboy*'s employees are women, that *Playboy* tends to advocate equal rights for women. Most importantly, plaintiff has offered the testimony of two female fire fighters, Fire Captain Deborah Lawrence and Firefighter Specialist Jerilynn Haertsch, who claim that they are not offended by the quiet reading of *Playboy* in the fire department. Because, however, defen-

### b. Evidence that the Reading of Playboy may Influence Behavior of Male Fire Fighters

The second category of evidence is testimony which defendants claim establishes that the reading of *Playboy* may influence the way male fire fighters treat female fire fighters. According to defendant's expert Dr. Daniel Linz, the reading of *Playboy* may result in "sex-role stereotyping" in the minds of the readers. This "sex-role stereotyping" may result in inequitable treatment of women or even sexual harassment. The Court must reject this category of evidence for two reasons.

First, the defendants' effort to regulate the behavior of male fire fighters by regulating the material which they may read is categorically impermissible. It is a fundamental principle of First Amendment law that the government cannot regulate material in order to prevent the readers from developing certain ideas. *See, e.g., American Booksellers Ass'n,* 771 F.2d at 323. Such regulations are attempts at altering the reader's viewpoint, and as such are the most disfavored of all regulations touching upon the First Amendment. *See R.A.V. v. City of St. Paul,* — U.S. —, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

Defendants are, of course, free to proscribe offensive behavior or language which may result from the "sex-role stereotyping." But, defendants may not proscribe the communication of "sex-role stereotyping" simply because defendants disagree with the message.

Second, even if defendants could permissibly regulate reading material in order to prevent the "stereotyping" of female fire fighters, the Court could not on the present record find that defendants have carried its burden of showing that reading *Playboy* actually leads to such "stereotyping." Furthermore, the Court could not on the

present record find that the existence of "sex-role stereotyping" leads to an harassing environment.

Dr. Linz testified that, in his expert opinion, the reading of *Playboy* leads to sex-role stereotyping and that sex-role stereotyping leads to sexual harassment. However, his conclusions were based upon two studies which are inconclusive and are based on factual scenarios posing little resemblance to the present case. The first study, performed by McKenzie–Mohr & Zanna,[8] involved 60 males between the ages of 18 and 24. The study divided the males into "masculine sex-type" and androgynous. It then showed some of the males a pornographic film of a prostitute having sex with a client. It showed others a speech on the House of Commons. The study concluded that the pornographic film had an effect on the way some of the "masculine sex-type" males perceived and reacted to the female interviewer.

In the second study, performed by Imrich & Linz,[9] a number of males were shown films which were divided into three categories: sexually degrading, sexually educational (i.e., sexually explicit, but not degrading), and neutral. After watching the film, the men interviewed two female job applicants. The study showed that the sexually degrading films had no effect on the manner in which the men evaluated or remembered the female applicant. At the same time, both the sexually degrading as well as the sexually educational films heightened the possibility that the men would classify the female applicants as untrustworthy, incompetent or incomprehensible.

The testimony of Dr. Neil Malamuth was offered by plaintiff to rebut the testimony of Dr. Linz. According to Dr. Malamuth, the McKenzie and Imrich studies have no probative value in determining the impact that *Playboy* has on male fire fighters. To begin with, the studies involved films which included explicit intercourse. *Playboy* merely con-

---

dant has failed to offer evidence to the contrary, the Court need not engage in such balancing.

**8.** McKenzie–Mohr & Zanna, *Treating Women as sex objects: Look to the (gender schematic) male who has viewed pornography,* 16 Pers. & Socs. Psych.Bull. 296 (1990).

**9.** Imrich & Linz, *The effects of sexually degrading versus nondegrading pornography on sexist reactions to women.*

tains photographs of nude women; it contains no explicit depictions of intercourse. Secondly, the studies were based on college-age males. Most male fire fighters are older. Third, the studies utilized a scientifically inadequate number of subjects and used questionable control groups. Finally, Dr. Malamuth pointed out that the two studies offered inconclusive and ambiguous conclusions and that some of these conclusions actually support a finding that the reading of *Playboy* has no impact on a male fire fighter's treatment of his female coworkers. For example, the Imrich study found that pornographic films had no influence on the males' rating of the female job applicant.

The claim that there is a connection between the reading of *Playboy* and "sexual stereotyping" is, in Dr. Malamuth's opinion, a viable hypothesis. It is, however, nothing more than that—based upon the present state of scientific studies, the connection between *Playboy* and "sexual stereotyping" is not a scientific probability, much less a scientific certainty.

The Court finds the testimony of Dr. Malamuth to be credible and persuasive. Accordingly, the Court must find that defendants have failed to prove that there is a connection between *Playboy* and "sexual stereotyping," and between "sexual stereotyping" and sexual harassment.

In short, the Court must reject defendants' argument that the ban of *Playboy* furthers defendants' interest in maintaining an efficient operation because the reading of *Playboy* may influence male fire fighters to treat their female coworkers poorly. First, the defendants may not attempt to shape the thoughts of its employees by restricting the materials which they may read. Second, the defendants have simply failed to establish that there is in fact a causal link between the reading of *Playboy* and the poor treatment of female fire fighters.

### 4. *The Balancing of Interests*

██ Under the *Pickering/Connick/Rankin* test, the Court must balance the plaintiff's and defendants' interest. The Court has found that the present regulation poses a severe burden on plaintiff's First Amendment rights, both because it is content-based, and because of the manner, time and place of the proposed speech. Furthermore, the Court has found the defendants have failed to produce evidence which establishes that the quiet reading of *Playboy* contributes to a sexually harassing atmosphere. Accordingly, the defendants have failed to show that the ban of *Playboy* is directly related to the defendants' interest in maintaining an efficient operation. The Court must find the regulation invalid as applied to plaintiff.

### IV. *Facial Challenges*

██ Because the Court has found that the sexual harassment policy is invalid as applied to plaintiff, the Court need not address whether the statute is unconstitutionally overbroad or vague. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).

### V. *Conclusion*

Defendants' desire to eliminate sexual harassment in the fire stations is laudable. Defendants must, however, do so in a constitutionally permissible manner. Defendants may not ban the reading of *Playboy* simply because they disagree with the manner in which *Playboy* portrays women.

If defendants choose to impose a content-based regulation on employees' speech, they must produce evidence that the speech contributes directly to a sexually harassing environment. In the present case, they have simply failed to show that plaintiff's quiet reading of *Playboy* contributes to such an environment.

Accordingly, the Court must find that the County's sexual harassment policy is invalid as applied to plaintiff's quiet possession, reading and sharing of *Playboy* magazine.

IT IS SO ORDERED.